**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patagonia Area Resource Alliance, et al., | No. CV-23-00280-TUC-JGZ |
| Plaintiffs, | **ORDER** |
| v. | |
| United States Forest Service, et al., | |
| Defendants. | |

Plaintiffs, eight environmental organizations, filed this action against Defendants United States Forest Service and Kevin Dewberry (collectively USFS) under the Administrative Procedures Act (APA), alleging USFS's approval of exploratory mining projects violated the National Environmental Policy Act (NEPA). (Doc. 1.) Plaintiffs seek a preliminary injunction stopping two projects: Arizona Standard LLC's Sunnyside Project and South32 Hermosa Inc.'s Flux Canyon Project. (Doc. 25.) On July 11, 2023, the Court granted Arizona Standard and South32's motions to intervene. (Doc. 19.) On July 24, 2023, the Court granted the Town of Patagonia's request to file an amicus memorandum in support of Plaintiffs' Motion. (Doc. 36.) Plaintiffs' Motion is fully briefed. (Docs. 25–29, 34, 37–40, 44.) On August 24, 2023, the Court held Oral Argument. (Doc. 47.) For the reasons that follow, the Court will deny Plaintiffs' Motion for Preliminary Injunction.

//
//
//

## I. Background

The Coronado National Forest stretches across nearly 1.8 million acres in Arizona and New Mexico. (Doc. 26-4 at 7.) Within this forest, in southeastern Arizona, sits the Patagonia Mountains. (*Id.* at 7, 34.) The Patagonia Mountains are known as "sky islands," rising abruptly amid grassland and desert scrub to form forest islands within a "desert sea." (*Id.* at 34.) Several species listed under the Endangered Species Act occupy or roam the Patagonia Mountains. (*Id.* at 35.) These species include the Mexican spotted owl, yellow-billed cuckoo, jaguar, ocelot, Bartram's stonecrop, and monarch butterfly. (*Id.*) Beneath the Patagonia Mountains lies the Cienega Creek basin and the Sonoita Creek watershed. (*Id.* at 64.) The Town of Patagonia, home to about 900 residents, is located in the valley of the Sonoita Creek. (*See id.*) Little is known about the deeper Cienega Creek basin, but the overlapping Sonoita Creek watershed is the Town of Patagonia's sole source of portable water. (*Id.*)

USFS approved two exploratory drilling projects in the Patagonia Mountains: Arizona Standard's Sunnyside Project and South32's Flux Canyon Project. (*See* Docs. 27-1; 27-8.) The Sunnyside Project is located about four miles south of the Town of Patagonia and will require about 7.5 acres of ground disturbance. (Doc. 26-4 at 7, 14.) The Flux Canyon Project is about one mile further south and involves 1.8 acres of ground disturbance. (*Id.* at 84; Doc. 27-8 at 5, 7.)

### A. NEPA Procedures

In evaluating these proposed projects, USFS needed to comply with NEPA regulations, which set forth three different paths for project approval. *See* 40 C.F.R. §§ 1500.3, 1501.3. First, an agency must prepare an Environmental Impact Statement (EIS) if a project is likely to have significant effects on the environment. *See id.* § 1501.3(a)(3). Second, if it is unlikely that a project will have significant effects, or if the significance of effects is uncertain, the agency may prepare an Environmental Assessment (EA). *See id.* § 1501.3(a)(2). An EA is brief public document that discusses a project's environmental impacts, alternatives, and evidence and analysis for determining whether the agency should

prepare an EIS or issue a Finding of No Significant Impact (FONSI). *See id.* § 1501.5; *see also* 40 C.F.R. § 1508.9 (2019). An agency's EA must demonstrate that the agency took a "hard look" at the likely effects of the proposed project. *Native Ecosystems Council v. USFS*, 428 F.3d 1233, 1239 (9th Cir. 2005). Third, an agency need not prepare an EIS or EA when a project falls within a categorical exclusion (CE). 40 C.F.R. §§ 1501.3(a)(1), 1501.4(a). By definition, CEs are categories of actions which "normally do not have a significant effect on the human environment," and therefore do not require preparation of an EA or EIS. *See id.* § 1501.4(a). If there are extraordinary circumstances for a project, the agency must determine whether the project still qualifies for a CE or requires an EA or EIS. *See id.* § 1501.4(b).

### B. Sunnyside Project

The Sunnyside Project is a seven-year exploratory drilling project, requiring the construction of thirty drill pads within three drill areas. (Doc. 26-4 at 7.) Up to two drill rigs may operate at any time, twenty-four hours a day, seven days a week. (*Id.* at 20.) The project will require about thirty-six workers, the transportation of heavy equipment, and the clearing of 7.5 acres. (*Id.* at 14, 20.) Arizona Standard will remove no more than 180 trees with a greater than five-inch diameter-at-breast-height and purchase all such trees through a timber sales contract. (*Id.* at 15.) Reclamation and revegetation efforts will begin in the first year of the project and continue contemporaneously with drilling until completion. (*Id.* at 24.) Arizona Standard must monitor the progress of reclamation for up to six years following seeding, or until USFS approves of the reclamation, whichever occurs sooner. (*Id.*) In addition to the restoration of land it will disturb, Arizona Standard will restore 4.2 acres of already disturbed land. (*Id.* at 23.)

Specific features of the project will help mitigate disturbances to wildlife, including activity restrictions during the Mexican spotted owl's breeding season, monitoring of the owl during and after the project, and a requirement that Arizona Standard fit all engines with mufflers and point all light downwards at night. (*Id.* at 103.) Twenty-five design features also help monitor and mitigate the risk of harming the local water supply. (*Id.* at

101.) These features include periodic sampling and testing of water, installation of temporary sediment barriers, and the permanent sealing of boreholes with Wyoming grade bentonite mud and cement plugs. (*Id.* at 101–03.)

In January 2023, after responding to hundreds of public comments and consulting with twelve Native American Tribes, USFS completed an EA for the Sunnyside Project. (*Id.* at 2, 11.) In June 2023, USFS issued a FONSI, determining that the Sunnyside Project would not have significant effects on the quality of the human environment. (Doc. 27-1 at 22.)

### C. Flux Canyon Project

The Flux Canyon Project is a twelve-month exploratory drilling project, requiring the construction of about 2,000 feet of road and six drill pads. (Doc. 27-8 at 5.) South32 will complete all drilling and construction activities within seven months. (*Id.*) During that time, drilling operations may continue twenty-hours a day, seven days a week. (*Id.*) The project will disturb 1.8 acres of National Forest land. (*Id.*) From the third to the seventh month of the project, South32 will complete reclamation activities on all temporarily disturbed land contemporaneously with drilling. (*Id.*) South32 will monitor its reclamation efforts for the remaining five months of the project. (*Id.*) All project activities will be complete within twelve months. (*Id.*)

In August 2022, USFS began a public scoping period; contacted 506 government entities and agencies, tribes, partner groups, and individuals; and received and responded to eighteen comments. (*Id.* at 10.) In May 2023, USFS issued a Decision Memo, finding the Flux Canyon Project eligible for a CE under 36 C.F.R. 220.6(e)(8) as a mineral, energy, or geophysical investigation which will last no more than one year, including incidental support activities. (*Id.* at 4.) USFS considered ten federally listed species and the local water conditions before determining the project would not significantly affect the environment. (*See id.* at 11–17.)

//

//

### D. Legal Challenge to Projects

On June 20, 2023, Plaintiffs filed this action, alleging USFS's authorization of the two projects violated NEPA. (Doc. 1 ¶ 9.) On July 14, 2023, Plaintiffs filed a Motion for Preliminary Injunction under Rule 65(a) of the Federal Rules of Civil Procedure. (Doc. 25 at 11.) Arizona Standard and South32 agreed to forego any ground-disturbing activities until September 15, 2023, to allow time for the litigation of Plaintiffs' Motion. (Doc. 15 at 2–3.) The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

## II. General Standards of Review

NEPA mandates the process an agency must follow but does not impose any substantive requirements on an agency's decision. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005). Because NEPA provides no private right of action to enforce its requirements, a plaintiff must bring suit under the APA. *See id.* Under the APA, a court shall hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency decision is arbitrary and capricious if the agency relied on factors which Congress did not intend it to consider; completely failed to consider an important facet of the problem; or provided an explanation for its decision that conflicts with the evidence before the agency or is so implausible it could not be attributed to the product of agency expertise or a difference in view. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In the context of an alleged violation of NEPA, courts must determine whether the agency has met NEPA's hard look requirement, based its decision on a consideration of relevant factors, and presented a convincing statement of reasons why a project's effects on the environment are insignificant. *Ctr. for Cmty. Action & Env't Just. v. FAA*, 61 F.4th 633, 639 (9th Cir. 2023).

//
//
//

## III. Discussion

A preliminary injunction is an extraordinary and drastic remedy never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A partying requesting a preliminary injunction must show (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction may only be awarded when the movant provides a clear showing that it is entitled to such relief. *Id.* at 22. Using these factors, the Court will address the challenges to the Sunnyside Project and Flux Canyon Project separately.

### A. Sunnyside Project

#### 1. Merits

Plaintiffs advance three reasons why they are likely to succeed on the merits: (1) USFS did not adequately consider cumulative impacts; (2) USFS failed to take a hard look at the Sunnyside Project's impacts to Mexican spotted owls; and (3) USFS did not adequately analyze baseline water conditions. (Doc. 25 at 21, 27, 30.) To show likelihood of success on the merits, Plaintiffs must show it is reasonably likely they will succeed. *See O'Brien v. O'Laughlin*, 557 U.S. 1301, 1302 (2009). Plaintiffs have not shown it is reasonably likely that any of their three arguments will succeed.

##### a. Cumulative Impacts

Under NEPA, an EA must briefly discuss the environmental impacts of the proposed project and any alternatives. 40 C.F.R. § 1501.5(c)(2). Environmental impacts "means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable." *Id.* § 1508.1(g). They include direct, indirect, and cumulative effects. *Id.* § 1508.1(g)(1)–(3). The purpose of evaluating cumulative impacts is to prevent an agency from dividing a large project into multiple smaller actions to avoid full consideration of the entire project's environmental impacts. *Tinian Women Ass'n v. U.S. Dep't of the Navy*, 976 F.3d 832, 838 (9th Cir. 2020). An agency must provide some

quantified or detailed information when considering cumulative impacts. *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005). Its cumulative-impacts analysis must also be useful and more than perfunctory. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002). Even assuming USFS's analysis is lacking, the burden is on Plaintiffs to show that USFS's ultimate conclusion was unreasonable. *See Ctr. for Cmty. Action & Env't Just.*, 61 F.4th at 640.

Plaintiffs argue USFS's cumulative-impacts analysis did not fully consider the Flux Canyon Project and private-land Hermosa Project and ignored the Hermosa Critical Minerals Project. (Doc. 25 at 22–24.) These arguments are unpersuasive. Plaintiffs have not shown USFS's ultimate conclusions on cumulative impacts were unreasonable. *See Ctr. for Cmty. Action & Env't Just.*, 61 F.4th at 640.

First, Plaintiffs argue USFS failed to analyze the cumulative impact of the Sunnyside Project and Flux Canyon Project on Mexican spotted owls, yellow-billed cuckoos, jaguars, and ocelots. (Doc. 25 at 22.) USFS completed a detailed analysis of the Sunnyside Project's impacts on these species. (Doc. 26-4 at 39–42.) Although USFS did not mention the Flux Canyon Project in its analysis of the cumulative impacts for each species, USFS described the Flux Canyon Project and which species it would impact in a table, (*id.* at 32), and incorporated that table into its summary of cumulative impacts, (*id.* at 43). The Ninth Circuit has held an agency may incorporate projects into an environmental baseline and measure the incremental impact of a proposed project against that baseline. *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1112 (9th Cir. 2015). Under this reasoning, USFS's consideration of the Flux Canyon Project is adequate. *See id.*

What is more, even assuming USFS's analysis falls short and requires more quantitative or detailed analysis, *see Ocean Advocs.*, 402 F.3d at 868, this misstep does not undermine USFS's final conclusion, *see Ctr. for Cmty. Action & Env't Just.*, 61 F.4th at 640. In the table mentioned above, USFS explained the Flux Canyon Project will disturb less than two acres of land and involve only seven months of exploratory drilling. (Doc.

26-4 at 32.) The private land Hermosa Project, by contrast, is a long-term exploratory drilling and potential mining operation encompassing 450 acres. (*Id.*) In summarizing the cumulative impact of other projects with the Sunnyside Project, USFS stated the private-land projects, like the Hermosa Project, accounted for the greatest amount of cumulative impact. (*Id.* at 43.) In fact, the private-land projects amounted to 39.6 percent of the cumulative-effects analysis area for the Mexican spotted owl and yellow-billed cuckoo, and 8.3 percent of the cumulative-effects analysis area for the jaguar and ocelot. (*Id.*) It is unlikely that the two-acre short-term Flux Canyon Project, at just 0.4 percent the size of the Hermosa Project, would affect these numbers in any material way.

Plaintiffs next argue USFS failed to fully consider the private-land Hermosa Project and inaccurately claimed no details were available on the project's timeline aside from an expected start date within the next ten years. (Docs. 25 at 23; 26-4 at 32.) In support, Plaintiffs point to South32's Hermosa Project Update, claiming the Update shows "the project portends 22 years of mining with first production targeted for Fiscal Year 2027." (Doc. 25 at 24.) The Hermosa Project Update, however, reported the results of South32's pre-feasibility study. (Doc. 28-5 at 2.) It did not provide specific details as to the project's timeline. Plaintiffs infer those details from the project's target start date in 2027, a date contingent on South32's receipt of investments and required permits, and an estimated resource life of twenty-two years. (*Id.* at 5.) Although far from final, the target start date is consistent with USFS's stated expectations. (*See* Doc. 26-4 at 32.) And estimated resource life is no substitute for an actual timeline of project activities when USFS must complete a meaningful analysis of the effects of those activities. *See Env't Prot. Info. Ctr. v. USFS*, 451 F.3d 1005, 1014 (9th Cir. 2006) (USFS need not make impractical projections if not enough information is available to permit meaningful consideration).

Notably, USFS also analyzed the noise and visual disturbances already arising from the private land where South32 has begun exploratory drilling in advance of the Hermosa Project. (Doc. 26-4 at 44–47.) USFS considered these disturbances and noted they may be affecting the Mexican spotted owl, yellow-billed cuckoo, jaguar, and ocelot, as well as

degrading their habitat. (*See id.*) And, as discussed above, USFS specifically addressed the private land projects, such as the Hermosa Project, in its summary of cumulative impacts, acknowledging the great risk these projects posed for listed species. (*Id.* at 43.) Plaintiffs have not shown USFS failed to consider a project timeline or reached an arbitrary conclusion as to the Hermosa Project.

Plaintiffs also argue USFS arbitrarily excluded the Hermosa Critical Minerals Project from its cumulative-impacts analysis. (Doc. 25 at 22–23.) According to Plaintiffs, South32 announced this project, and USFS's role as the lead agency for the government, five months after the Sunnyside EA and one month before the Sunnyside FONSI. (*Id.*) Based on this information, Plaintiffs ask the Court to infer that USFS was aware of South32's FAST-41 application and the project when USFS completed the Sunnyside EA and FONSI. (*Id.*) USFS contends this project was not reasonably foreseeable when it completed the EA because it was unaware of the project, South32 submitted its application to a separate federal agency, and South32 had not yet submitted a mining plan of operations. (Oral Argument; Doc. 38 at 19.) For these reasons, USFS argues it was not required to analyze or speculate about the project. (*Id.*)

South32's announcement for this project does not establish that USFS received or knew of the FAST-41 application. The announcement states South32's application was confirmed by the U.S. Federal Permitting Improvement Steering Council, an independent federal agency, as the FAST-41 program's first mining project. (Doc. 28-6 at 2.) "Reasonably foreseeable means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision." 40 C.F.R. § 1508.1. The Permitting Council's listing of USFS as the lead agency for the Hermosa Critical Minerals Project does not establish USFS's knowledge of the project five months earlier. And Plaintiffs have not shown what project information South32 included in its FAST-41 application, when the Permitting Council received the application, or whether USFS was privy to any of the information South32 submitted to the Permitting Council. Nor do Plaintiffs point to a timeline of project activities or other details in South32's

announcement which USFS could have meaningfully considered in its EA. *See Env't Prot. Info. Ctr.*, 451 F.3d at 1014. On this record, Plaintiffs have not shown that the Hermosa Critical Minerals Project was reasonably foreseeable or that USFS should have taken it into account when completing its cumulative-impacts analysis.

### b.   Mexican Spotted Owl

Plaintiffs argue USFS did not take a "hard look" at the Sunnyside Project's impact on Mexican spotted owls. (Doc. 25 at 27.) Examination of the agency's stated reasons for its conclusion is crucial to determining whether it took a "hard look" at the potential environmental impact of a project. *Ctr. for Cmty. Action & Env't Just.*, 61 F.4th at 639. It appears that USFS relied on United States Fish and Wildlife's (USFWS) Biological Opinion which misconstrued a scientific study, Delaney (1999), and its findings on the effects of sound on the owl. (Doc. 26-5 at 36, 41.) USFWS cited this study, referencing its threshold for injury from aerial sound rather than its threshold for injury from ground-level sound. (*Id.*; Doc. 25 at 27–28.) Indeed, the threshold for ground-level sound would be more analogous here because the sound of the project's drilling operations will arise from the ground.

Even so, the Delaney study and the difference between the two sound thresholds were not central to USFS's conclusion. To be sure, USFS eventually adopted the breeding restrictions discussed by USFWS, (Doc. 26-4 at 40), and that discussion by USFWS included a citation to the Delaney study, (Doc. 26-5 at 36). Yet, USFWS's restrictions were based on its recovery plan for the owls rather than the Delaney study. (*See id.*) USFWS also cited the Delaney study for the proposition that owls might leave the area during the project but would not permanently desert the area. (*Id.* at 41.) USFS, however, did not cite the Delaney study at all or base any of its conclusion on specific sound thresholds for the owls. (Doc. 26-4 at 39–40.) Instead, USFS found that the Sunnyside Project accounted for less than 0.001 percent of the owl's critical habitat and, upon completion, it would provide 4.2 acres of additional habitat. (*Id.* at 40.) USFS thus concluded, even if the owls abandon the area for the project's entire duration, as Plaintiffs' sound calculations suggest, the owls

and their habitat would not suffer substantial long-term harm from the project. (*Id.*) USFWS's misreading of the Delaney study and its stated sound thresholds for the owls do not undermine USFS's final conclusion. *See Ctr. for Cmty. Action & Env't Just.*, 61 F.4th at 639–40.

### c. Baseline Water Conditions

Plaintiffs argue USFS's decision not to further analyze baseline groundwater conditions is arbitrary and capricious. (*See* Doc. 25 at 30–31.) Plaintiffs and amicus curiae Town of Patagonia state concerns about the quality of groundwater in the project area and the risk of groundwater exchange between aquifers during deep exploratory drilling. (*Id.*; Doc. 37 at 4.) They argue USFS's failure to establish baseline groundwater conditions threatens the sole source of drinking water for the Town of Patagonia and all nearby residences. (Docs. 25 at 30–31; 37 at 4.) Under NEPA, establishing baseline conditions is a practical requirement rather than an independent legal requirement. *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016). An agency may estimate baseline conditions using computer modeling, data from a similar area, or some other reasonable method. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016).

In its EA, USFS included an eight-page analysis on water resources. (Doc. 26-4 at 64–71.) USFS analyzed a 2001 baseline study of groundwater conducted by Arizona Department of Environmental Quality. (*Id.* at 66.) Although only 1 of the 20 wells in the study are within the project area, all 20 wells fell within the Cienega Creek groundwater basin, which is the single basin where project-related activities would occur. (*Id.* at 64, 66.) To be sure, the lone well within the project area showed elevated levels of arsenic and barium. (*Id.* at 66.) Yet, it is unclear whether that is from natural causes or human activity, (*id.*), and in any event, those levels still meet Arizona's drinking water standard, (*compare* 18 A.A.C. § 11-406(B) (standard for arsenic and barium is 0.05 mg/L and 2 mg/L, respectively), *with* Doc. 26-4 at 66 (well's arsenic and barium levels were 0.0295 mg/L and 0.019 mg/L, respectively)). More importantly, Plaintiffs criticize USFS's conclusion but offer no reasonable alternative for assessing baseline groundwater conditions. During

the public comment period, USFS responded to a request for a "comprehensive surface and groundwater study." (Doc. 27-3 at 7.) USFS explained a detailed study would require drilling operations similar in scope to the Sunnyside Project. (*Id.*) It is likely that the detailed baseline analysis of the Cienega Creek basin sought by Plaintiffs and amicus curiae would be impractical and not be required by NEPA. *See Or. Nat. Desert Ass'n*, 840 F.3d at 568.

The record shows USFS's analysis of water resources is reasonable. The project includes twenty-five features designed to protect water resources, mitigate the risk of groundwater exchange between aquifers, and periodically test the water to ensure it meets quality standards. (Doc. 26-4 at 101–03.) USFS relied on comprehensive data of twenty wells within the Cienega Creek basin and made reasonable inferences based on the project circumstances, potential alternatives, and its scientific expertise. (*See* Docs. 26-4 at 64–71; 27-3 at 7.) The Court cannot conclude that USFS's approach to determining baseline groundwater conditions is likely arbitrary and capricious. *See, e.g.*, *Concerned Citizens & Retired Miners Coal. v. USFS*, 279 F. Supp. 3d 898, 936 (D. Ariz. 2017) (USFS's decision not to require site-specific data on baseline water conditions is entitled to deference when USFS makes reasonable inferences from scientific data).

### 2.     **Irreparable Harm**

Courts must not issue preliminary injunctions unless an applicant shows it is likely to suffer irreparable harm before a decision on the merits can be rendered. *Winter*, 555 U.S. at 22; *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011). Plaintiffs argue the Sunnyside Project will harm their members' enjoyment of the undisturbed forest and interest in the preservation of the Mexican spotted owl. (*See* Doc. 25 at 37–39.) The Sunnyside Project area, however, encompasses only 7.5 of the 1,800,000 acres in the Coronado National Forest. (Doc. 26-4 at 7, 14.) The project also establishes restrictions on the trees which may be removed and requires up to six years of monitoring after the seeding of reclamation areas. (*Id.* at 15, 24.) Plaintiffs have not demonstrated their members will likely suffer irreparable harm to their recreational

interests without a preliminary injunction.

Similarly, for the Mexican spotted owl, Plaintiffs have not established that the species or its habitat will sustain irreparable injury before the Court can render a decision on the merits. Plaintiffs contend chronic noise for up to seven years would likely cause the owl to permanently abandon their territories for the duration of the project. (Doc. 25 at 39.) A decision on the merits would likely take months, perhaps a year, but certainly not seven years. It is unlikely the owl will face the irreparable harm Plaintiffs contemplate within this shorter timeframe. Indeed, USFS and USFWS concluded the owls will not suffer any significant long-term harm and any owls that depart during the project will likely return to the area when the project ends. (Doc. 26-4 at 40, 45; Doc. 26-5 at 33–41.)

Plaintiffs also argue that even six to twelve months of drilling noise will irreparably harm the owl by impairing its ability to forage and pushing it into substitute habitat that is unlikely to exist. (*See* Docs. 26-1 ¶ 16; 44 at 35.) But the project area encompasses less than 0.001 percent of the owl's designated critical habitat area. And the larger Hermosa Critical Minerals Project and Hermosa Project, which could change the cumulative effects on the owl, will probably not begin until at least 2026 and 2027, respectively. (*See* Docs. 28-5 at 5 (Hermosa Project); Doc. 28-7 at 3 (Hermosa Critical Minerals Project).) The noise disturbance from these projects will not overlap with the Sunnyside Project's operations any time soon. Plaintiffs have not shown that short-term disturbances while the Court reaches a decision on the merits will likely leave the owl with no place to nest or forage.

### 3. Balance of Equities and Public Interest

Under the next factor, balance of equities, the Court weighs the harm Plaintiffs would suffer if it denied the injunction against the harm Arizona Standard would suffer if it granted the injunction. *See Winter*, 555 U.S. at 33; 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.2 (3d ed. 2023). As discussed above, Plaintiffs have established some harm—impairment to their members' recreational interests and the likelihood that Mexican spotted owls in the vicinity must temporarily depart—but have not shown any irreparable harm. Similarly, Arizona Standard argues it

would suffer substantial financial harm should an injunction issue and delay its project. (Doc. 40 at 34.) But such harm would not be permanent in nature and could be compensated with monetary damages or a bond. This factor favors neither Plaintiffs nor Arizona Standard.

For the final factor, the Court considers the impact of the preliminary injunction on non-parties and the public. *See Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 946 (9th Cir. 2013). There is a long-standing public interest in preserving nature and requiring careful consideration of environmental impacts before projects proceed. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). Congress has also found it in the nation's interest to encourage private companies to mine domestic resources. *See* 30 U.S.C. § 21a. Plaintiffs have shown potential environmental harm but no irreparable injury. Although the exploratory Sunnyside Project has the potential to uncover important natural resources, its utility is not yet certain. This factor is thus neutral.

**B.     Flux Canyon Project**

**1**.     **Merits**

Plaintiffs argue USFS arbitrarily failed to complete a cumulative-impacts analysis, invoked a CE, and discounted extraordinary circumstances. (Doc. 25 at 26, 33, 35.) Plaintiffs have not met their burden to show likelihood of success as to these arguments. *See O'Brien*, 557 U.S. at 1302.

**a.     Cumulative Impacts**

In their motion for preliminary injunction, Plaintiffs contend USFS failed to consider any cumulative impacts during the scoping process that resulted in USFS finding the Flux Canyon Project eligible for a CE. (Doc. 25 at 26.) In response, South32 argues that pre-2020 regulations governed this CE and did not require a cumulative-impacts analysis. (Doc. 39 at 12.) In reply, Plaintiffs assert that post-2020 regulations required USFS to complete a cumulative-impacts analysis. (Doc. 44 at 18–19.) The Court concludes neither regulation required USFS to complete a separate, written cumulative-impacts

analysis.

The pre-2020 regulations defined "categorical exclusion" as "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (2019). By definition, a project approved under a CE does not have, individually or cumulatively, a significant effect on the environment. An agency's invoking of a CE therefore does not require a separate cumulative-impacts analysis. *See Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013); *Sierra Club v. USFS*, 828 F.3d 402, 411 (6th Cir. 2016); *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006).

The 2020 revisions to NEPA regulations by the Council on Environmental Quality (CEQ) do not change this conclusion. A CE is now defined as "a category of actions that the agency has determined . . . *normally* do not have a significant effect on the human environment." 40 C.F.R. § 1508.1 (emphasis added). According to CEQ, this revision clarifies that "there may be situations where an action may have significant effects on account of extraordinary circumstances." Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,342 (July 16, 2020) (codified at 40 C.F.R. § pts. 1501–08, 1515–18). Further analysis of a project's significant effects thus falls under an extraordinary-circumstances analysis rather than a cumulative-impacts analysis. This is consistent with CEQ's removal of the term "cumulative impacts" from its regulatory definitions and its more holistic definition of "effects," which includes reasonably foreseeable cumulative effects. *See* 40 C.F.R. § 1508.1(g). Because a CE's significant effects, if any, must be considered under an extraordinary-circumstances analysis, Plaintiffs have not shown USFS was required to complete a separate cumulative-impacts analysis for the Flux Canyon Project.

### b.   Eligibility for CE

USFS approved the Flux Canyon Project under the 36 C.F.R. § 220.6(e)(8) CE. (Doc. 27-8 at 4). This CE applies to "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities." *Id.* § 220.6(e)(8).

Activities that require reclamation include the clearing of vegetation and the construction of less than one mile of road. *See id.* § 220.6(e)(8)(vii). Within the one-year time period, project operators must reshape and revegetate disturbed areas "where reasonably practicable." *Id.* § 228.8(g)(4).

First, Plaintiffs argue USFS arbitrarily invoked a CE for the Flux Canyon Project because it provided no rational basis for its conclusion that South32 could complete exploratory drilling, reclamation, and revegetation in one year. (Doc. 25 at 33.) In support, Plaintiffs compare the Flux Canyon Project's five-month revegetation period with the Sunnyside Project's three-year revegetation period. (*Id.* at 33–34.) The length of the Sunnyside Project's revegetation period, Plaintiffs argue, demonstrates South32 cannot adequately complete revegetation within the one-year project timeframe. (*Id.*)

In its Decision Memo, USFS explained that South32 will complete all reclamation activities within the project's twelve-month timeframe. (Doc. 27-8 at 5.) During the project's third month, South32 will begin reclamation activities, which will continue contemporaneously with drilling. (*Id.*) South32 will complete all drilling and reclamation activities by the seventh month, leaving five additional months to monitor revegetation. (*Id.*) The Flux Canyon Project involves the construction of up to 6 drill pads and total disturbance of 1.8 acres. (*Id.*) The Sunnyside Project, by contrast, involves the construction of up to 30 drill pads and a total disturbance of 7.5 acres. (Doc. 26-4 at 14.) Although the Sunnyside Project provides more time than the Flux Canyon Project for reclamation, it also requires far greater land disturbance and the construction of many more drill pads. This comparison does not show a defect in USFS's reasoning.

Plaintiffs also appear to distinguish reclamation activities from revegetation monitoring. They argue, even if South32 can complete reclamation activities during the project's seventh month, South32 must monitor revegetation for more than one growing season, which, naturally, will take longer than five months. (Docs. 25 at 33; 44 at 31.) This argument is unpersuasive. The CE applied here offers examples of covered operations, including construction of one-third mile of road and the clearing of an acre of vegetation

for drill pads. 36 C.F.R. § 220.6(e)(8)(vii). It seems unlikely that most environments could return to pre-operation vegetation conditions less than one year after an operator has cleared an acre of vegetation. And although Plaintiffs suggest there might be some environments where this is possible, (Doc. 44 at 31), USFS need only consider whether South32 could revegetate disturbed areas where reasonably practicable, *see* 36 C.F.R. § 228.8(g). South32 committed one third of its project time to contemporaneous reclamation activities and nearly one half of its project time to monitoring revegetation. Plaintiffs have not shown USFS's approval of these reclamation efforts lacks a rational basis.

### c. Extraordinary Circumstances

An agency may invoke a CE only if there are no "extraordinary circumstances" related to the proposed project. *Id.* § 220.6(a). Extraordinary circumstances are instances where "a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1507.3(e)(2)(ii). To evaluate whether extraordinary circumstances exist, agencies consider, among other things, relevant resource conditions and federally listed species. 36 C.F.R. § 220.6(b)(1). The yellow-billed cuckoo is a threatened species detected in the vicinity of the Flux Canyon Project. (Doc. 27-8 at 13.) In its Decision Memo, USFS concluded the project would not affect the yellow-billed cuckoo. (*Id.*) USFS reasoned that the project's surface disturbance would be minimal, the project's activities would not encompass drainage bottoms where cuckoo breeding typically occurs, and the nearest detected breeding locations (near drainage bottoms) were at least one-half of a mile away from the project. (*Id.*)

Plaintiffs argue USFS's conclusion is arbitrary and capricious because USFS neither surveyed the project location nor considered that the cuckoo's habitat might include hillsides and upland areas similar to those within the project area. (Doc. 25 at 36.) Yet, Plaintiffs cite no authority—and the Court finds none—requiring USFS to physically inspect project sites for endangered or threatened species. Further, uncertainty alone as to the cuckoo's presence within the project area does not render USFS's conclusion arbitrary or capricious. *See Ctr. for Biological Diversity v. Ilano*, 261 F. Supp. 3d 1063, 1070 (E.D.

Cal. 2017), *aff'd*, 928 F.3d 774 (9th Cir. 2019). USFS's explanation for its no-effect finding is not so implausible that it cannot be attributed to the product of agency expertise or a difference in view. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 2. Irreparable Harm

The Court must not issue a preliminary injunction unless Plaintiffs show they are likely to suffer irreparable harm before the Court can render a decision on the merits. *See Winter*, 555 U.S. at 22; *Park Vill. Apartment Tenants Ass'n*, 636 F.3d at 1160. For the same reasons discussed above for the Sunnyside Project, Plaintiffs have not shown they will likely sustain irreparable harm from the Flux Canyon Project. This project is also much smaller in size and shorter in duration than the Sunnyside Project, further limiting its potential to cause any irreparable harm. And like Arizona Standard's Sunnyside Project, South32 must also reclaim all temporarily disturbed areas. (Doc. 27-8 at 5, 8.) Moreover, no yellow-billed cuckoos or other listed species have been identified in the Flux Canyon Project area. (*Id.* at 12–17.)

### 3. Balance of Equities and Public Interest

For the reasons discussed above for the Sunnyside Project, these factors are also neutral for the Flux Canyon Project. Neither the potential environmental injury alleged by Plaintiffs nor the economic loss alleged by South32 outweighs the other. Similarly, the public has an established interest in both preventing potential environmental harm and searching for potential natural resources.

## III. Conclusion

Plaintiffs have neither shown a likelihood of success on the merits nor established a likelihood of irreparable harm as to either the Sunnyside Project or Flux Canyon Project. The *Winter* factors, taken together, favor denying Plaintiffs' Motion for Preliminary Injunction.

//

//

//

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 25) is **denied**. Plaintiffs may file an amended complaint within **30 days** from the date of this Order.

Dated this 1st day of September, 2023.

*/s/ Jennifer G. Zipps*
Jennifer G. Zipps
United States District Judge