Scott W. Stern (California Bar No. 336427)
(*admitted pro hac vice*)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
sstern@earthjustice.org
Phone: (415) 217-2117

Timothy J. Preso (Montana Bar No. 5255)
(*admitted pro hac vice*)
Earthjustice
313 East Main Street, PO Box 4743
Bozeman, MT 59715-4743
tpreso@earthjustice.org
Phone: (406) 586-9699

Roger Flynn (Colorado Bar No. 21078)
Jeffrey C. Parsons (Colorado Bar No. 30210)
(*admitted pro hac vice*)
Western Mining Action Project
PO Box 349, 440 Main Street, Suite 2
Lyons, CO 80540
wmap@igc.org
Phone: (303) 823-5738

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patagonia Area Resource Alliance; Arizona Mining Reform Coalition; Borderlands Restoration Network; Center for Biological Diversity; Earthworks; Friends of Santa Cruz River; Friends of Sonoita Creek; Save the Scenic Santa Ritas; and Tucson Audubon Society,<br><br>        Plaintiffs,<br><br>        v.<br><br>United States Forest Service; Kerwin S. Dewberry, Forest Supervisor, Coronado | Case No. 4:23-cv-00280-JGZ<br><br>SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

National Forest; and U.S. Fish and Wildlife )
Service,                                     )
                                             )
                    Defendants,              )
              and                            )
                                             )
Arizona Standard, LLC; and South32          )
Hermosa, Inc.,                              )
                                             )
                    Defendant-Intervenors.   )
                                             )
                                             )

2

**INTRODUCTION**

1.     This suit challenges the U.S. Forest Service and U.S. Fish and Wildlife Service's actions to approve the Sunnyside exploratory mineral drilling project in the heart of southeast Arizona's Patagonia Mountains, one of the most biologically diverse mountain ranges in the United States. Situated within the Coronado National Forest, these rugged mountains provide important habitat for numerous species protected under the Endangered Species Act ("ESA"). They contain nesting and foraging sites for the threatened Mexican spotted owl and Western yellow-billed cuckoo, and they represent a key movement corridor for the endangered jaguars and ocelots that recently and increasingly have been moving northward from Mexico to reoccupy their historic range in the United States. In addition, they provide the municipal water source for nearby communities, including the town of Patagonia, Arizona.

2.     But the Patagonia Mountains—and the rare and imperiled species they host—now face a severe threat from a wave of new mining activity. Defendant, the U.S. Forest Service ("USFS"), has approved a mineral exploration drilling project that threatens significant impacts in the most environmentally sensitive portion of these mountains. Specifically, on September 7, 2023, USFS approved the Plan of Operations for the Sunnyside Exploration Drilling Project, a seven-year program of exploratory drilling proposed by Arizona Standard, LLC—a subsidiary of Barksdale Capital Corporation, a Canadian metals exploration company—that seeks to prove up the resources for a future industrial copper-lead-zinc-silver mine in the area. The Sunnyside Project calls for development of as many as thirty new well pads with industrial

machinery running 24 hours a day, 7 days a week in the heart of the most biodiverse part of the Patagonia Mountains, amidst occupied nesting habitat for imperiled owls and cuckoos. Moreover, the Sunnyside Project development site is located adjacent to other ongoing and planned mineral projects in the Patagonia Mountains that involve additional significant industrial activity in this sensitive area.

3.    The combined impacts of these projects threaten to transform these mostly undeveloped public lands with a constant disruption of noise, lights, dust, human activity, and vehicle traffic for the foreseeable future. Such disruptions threaten to drive Mexican spotted owls and yellow-billed cuckoos from established breeding territories and to prevent jaguars and ocelots—both of which have been detected in recent years in nearby areas—from residing in or moving through the area. Such mineral development also threatens to pollute critical water resources in an arid region that nevertheless provides the sole water source for the town of Patagonia, Arizona, and nearby residents—more than a thousand people in all.

4.    USFS's approval of the Sunnyside Project triggered its obligations under the ESA and the National Environmental Policy Act ("NEPA"). First, the ESA required USFS to consult with the Defendant U.S. Fish and Wildlife Service ("FWS") to ensure that the project is "not likely to jeopardize the continued existence of any endangered species or threatened species" or destroy or adversely modify such species' designated critical habitat. 16 U.S.C. § 1536(a)(2). Here, regarding the Sunnyside Project, USFS engaged in formal ESA consultation with FWS. That consultation yielded a biological opinion authored by FWS that determined the project would not jeopardize ESA-listed

2

1  species or destroy or modify their critical habitat. In reaching those conclusions,

2  however, FWS failed to utilize the best available scientific and commercial data,

3  disregarded apparent cumulative impacts, and repeatedly applied irrational reasoning to

4  discount harm to imperiled wildlife. Nevertheless, USFS relied on FWS's biological

5  opinion to dismiss any potential for the Sunnyside Project to cause significant impacts to

6  ESA-listed species and to comply with USFS's own ESA obligations, without further

7  analysis. USFS applied a similarly flawed approach in analyzing environmental impacts

8  pursuant to NEPA. USFS determined that the Sunnyside Project presents no significant

9  impacts requiring a full environmental impact study.

10      5.      Yet USFS failed to adequately consider the cumulative impacts of the

11  Sunnyside Project when combined with other nearby mineral development activity in the

12  area. The Forest Service failed to fulfill this fundamental NEPA duty despite the fact that

13  this Court specifically admonished the agency to do so in rejecting the Forest Service's

14  authorization of an earlier version of the Sunnyside Project without adequate

15  environmental analysis in *Defenders of Wildlife v. U.S. Forest Serv.*, No. CV-14-02446-

16  TUC-RM (D. Ariz. Sept. 15, 2015). The threat of cumulative impacts from mineral

17  development in this sensitive area of the Patagonia Mountains has only grown since that

18  time. Nevertheless, USFS again failed to acknowledge or examine the combined impact

19  of such development activity on imperiled species and their habitats. USFS also failed to

20  take a hard look at the threat that Sunnyside Project drilling poses to affected water

21  resources, despite the risks that the Sunnyside Project poses to the drinking water of

22  nearby communities due to leakage of wastewater, contamination of groundwater, and

3

other impacts. And when the public attempted to raise such issues during USFS's

administrative process, the agency dodged its obligation to address important objections

on the merits by repeatedly dismissing them on improper and irrational bases.

6.      These oversights, omissions, misreadings, and failures violated the ESA

and NEPA. Accordingly, Plaintiffs—a collection of conservation and community

organizations dedicated to preserving the Patagonia Mountains from environmental

harm—now turn to this Court for relief. Specifically, Plaintiffs request that this Court

declare that the U.S. Forest Service and U.S. Fish and Wildlife Service violated the ESA

and NEPA in authorizing the Sunnyside Project, and issue an order setting aside the

defendant agencies' challenged actions.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to the citizen-suit

provision of the ESA, 16 U.S.C. § 1540(g)(1)(C), and 28 U.S.C. § 1331, because this suit

presents a federal question under the laws of the United States, including NEPA. This

Court also has jurisdiction under 28 U.S.C. § 1346, because the United States is a

defendant. Defendants' sovereign immunity is waived pursuant to the ESA and the

Administrative Procedure Act, 5 U.S.C. § 702.

8.      This Court has the power to grant declaratory and injunctive relief pursuant

to 28 U.S.C. §§ 2201–02 and 16 U.S.C. § 1540(g)(1)(A), and to compel agency action

and set aside the challenged decisions pursuant to 5 U.S.C. § 706(1) and (2)(A), and the

general equitable powers of this Court.

4

9.      Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Additionally, Plaintiffs Patagonia Area Resource Alliance, Arizona Mining Reform Coalition, Borderlands Restoration Network, Center for Biological Diversity, Friends of Santa Cruz River, Friends of Sonoita Creek, Save the Scenic Santa Ritas, and Tucson Audubon Society are headquartered in this District.

10.      This case should be assigned to the Tucson Division of this Court because the Patagonia Mountains lie within the counties of this Division, the challenged agency actions were taken within these counties, and Plaintiffs Patagonia Area Resource Alliance, Arizona Mining Reform Coalition, Borderlands Restoration Network, Center for Biological Diversity, Friends of Santa Cruz River, Friends of Sonoita Creek, Save the Scenic Santa Ritas, and Tucson Audubon Society are headquartered in this Division.

11.      Plaintiffs provided Defendants with 60 days' written notice of Plaintiffs' intent to sue under the ESA on July 13, 2023, as required by 16 U.S.C. § 1540(g)(2).

**PARTIES**

12.      Plaintiff Patagonia Area Resource Alliance ("PARA") is a grassroots organization of volunteer community members committed to protecting and preserving the Patagonia, Arizona, area. It is a watchdog organization that monitors the activities of mining corporations, as well as government agencies, to make sure their actions have long-term, sustainable benefits to the region's public lands, watershed, and broader ecosystem.

5

13.     Plaintiff Arizona Mining Reform Coalition ("AMRC") works in Arizona to improve state and federal laws, rules, and regulations governing hard rock mining to protect communities and the environment. AMRC works to hold mining operations to the highest environmental and social standards to provide for the long term environmental, cultural, and economic health of Arizona.

14.     Plaintiff Borderlands Restoration Network is a Patagonia, Arizona-based non-profit organization that works to grow a local restorative economy by rebuilding healthy ecosystems, restoring habitat for plants and wildlife, and reconnecting border communities to the land through shared learning. Its work is primarily focused on protecting and restoring wildlife corridors and the surface waters of Sonoita Creek and surrounding watersheds.

15.     Plaintiff Center for Biological Diversity ("CBD") is a non-profit public interest organization with a headquarters office located in Tucson, Arizona, representing more than 89,000 active members nationwide and dedicated to the conservation and recovery of threatened and endangered species and their habitats. CBD has a longstanding interest in projects of ecological significance undertaken in the National Forests of the Southwest, including mining projects.

16.     Plaintiff Earthworks is a non-profit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions. Earthworks stands for clean air, water and land, healthy communities, and corporate accountability. It works for solutions that protect both the Earth's resources and our communities.

6

17.     Plaintiff Friends of Santa Cruz River is a non-profit organization dedicated to ensuring the continued flow of the Santa Cruz River, the life-sustaining quality of its waters, and the protection of the riparian biological community it supports.

18.     Plaintiff Friends of Sonoita Creek is a non-profit organization dedicated to protecting and restoring the water and natural habitat of the Sonoita Creek Watershed. It informs residents and visitors about the watershed's importance to life forms and relationship to the geography through hands-on activities, presentations, hikes and collaboration with kindred organizations.

19.     Plaintiff Save the Scenic Santa Ritas is a non-profit organization that is working to protect the Santa Rita and Patagonia Mountains from environmental degradation caused by mining and mineral exploration activities.

20.     Plaintiff Tucson Audubon Society, founded in 1949, is a member-supported, non-profit organization dedicated to inspiring people to enjoy and protect birds and their habitats through recreation, education, wildlife conservation, advocacy, and protection and restoration of the environment on which we all depend. Drilling projects in the Patagonia Mountains would adversely impact a high-priority reservoir of biodiversity that Tucson Audubon has worked, and continues to work, to protect through a wide range of efforts. These efforts include designation of Important Bird Areas, research and conservation pertaining to numerous species at various levels of endangerment—including the Mexican spotted owl and Western yellow-billed cuckoo—and habitat-enhancement programs in the Sonoita Creek Watershed, most notably the Society's stewardship of 13.25 acres of riparian habitat, as well as its management of the

Paton Center for Hummingbirds, located in Patagonia, which receives 20,000 visitors annually from across the United States and the world. Tucson Audubon has approximately 3,200 members, many of whom live in southeast Arizona in areas that would be directly or indirectly impacted by the Projects at issue.

21.    Plaintiffs bring this action on their own institutional behalf and on behalf of their members. Members of each Plaintiff group use the lands and waters at and around the site of the Sunnyside Project for recreational, conservation, and aesthetic purposes. Members of each Plaintiff group hike, picnic, appreciate the undisturbed wildlife, and view and photograph wild plant and animal life in the Patagonia Mountains and within the specific Project area. Members of some of the Plaintiff groups participate in community-science research projects that contribute vital data for wildlife conservation in the area, and many take part in volunteer activities, such as trail maintenance, that contribute to the area's recreational, conservation, and aesthetic value. Many of Plaintiffs' members, officers, staff, and supporters moved to the Patagonia area precisely to pursue these aesthetic and recreational activities. Plaintiffs' members, officers, staff, and supporters have concrete plans to continue pursuing these activities in the Coronado National Forest and on the specific lands involved in the Project. Many of Plaintiffs' members live in the town of Patagonia, which is approximately seven miles from the Project site, and many of these members visit the Project area and surrounding lands on a daily or weekly basis.

22.    By authorizing the challenged Sunnyside Project and otherwise taking actions to facilitate this project, the USFS and FWS have approved actions that threaten

to significantly harm Plaintiffs' interests in the Patagonia Mountains and the specific Project area. The legal violations alleged in this complaint thus cause direct injury to the aesthetic, conservation, recreational, and wildlife preservation interests of Plaintiffs and their members. In addition, Plaintiffs, and their members, have been, and are being, harmed by USFS and FWS's failures to conduct a proper ESA or NEPA analysis and to fully involve the public—including Plaintiffs and their members—in the required NEPA process for the Project. Because of this failure, USFS and FWS have overlooked serious environmental impacts and underestimated and misstated the harms resulting from the Project, all to the detriment of Plaintiffs' interests.

23.    Plaintiffs' and their members' aesthetic, conservation, recreational, and wildlife preservation interests have been, are being, and, unless their requested relief is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual, concrete injuries that are traceable to Defendants' conduct. The relief that Plaintiffs request will redress the injuries of each Plaintiff group and their members.

24.    Each of the Plaintiff groups submitted extensive comments to USFS during public comment periods for the Sunnyside Project. In addition, each group submitted timely administrative objections to USFS regarding the Sunnyside Project, and submitted a 60-day notice letter to USFS and FWS detailing ESA violations regarding the Project. All of the issues and claims raised in this complaint were either previously raised to the defendant agencies or are based on information that became available to Plaintiffs only

9

after closure of the administrative comment and objections period for the Sunnyside

Project. In either case, they are properly before this Court for judicial review.

25.    Defendant United States Forest Service is a federal agency within the U.S.

Department of Agriculture. USFS is responsible for the management of National Forests,

including the Coronado National Forest. Among its management responsibilities, USFS

must ensure that activities it authorizes in the Coronado National Forest comply with

governing federal environmental statutes, including the ESA and NEPA. USFS

authorized the Sunnyside Project challenged in this case.

26.    Defendant Kerwin S. Dewberry, sued in his official capacity, is Forest

Supervisor of the Coronado National Forest. Defendant Dewberry is thus responsible for

managing the land in which the challenged Project is located and ensuring that activities

authorized on this land, including the challenged Project, comply with the ESA and

NEPA.

27.    Defendant U.S. Fish and Wildlife Service is a federal agency within the

U.S. Department of the Interior. FWS is responsible for administering the ESA with

respect to terrestrial species listed as threatened or endangered, including the jaguar,

ocelot, Mexican spotted owl, and Western yellow-billed cuckoo.

## LEGAL BACKGROUND

### I.    The Endangered Species Act

28.    "The ESA is 'the most comprehensive legislation for the preservation of

endangered species ever enacted by any nation.' It represents a commitment 'to halt and

reverse the trend toward species extinction, whatever the cost.'" *Ctr. for Biological*

1  *Diversity v. Zinke*, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting *Tenn. Valley Auth. v.*

2  *Hill*, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted). It also reflects "a

3  conscious decision by Congress to give endangered species priority over the 'primary

4  missions' of federal agencies." *Tenn Valley Auth.*, 437 U.S. at 185. The statute's purpose

5  is to "provide a means whereby the ecosystems upon which endangered species and

6  threatened species depend may be conserved, [and] to provide a program for the

7  conservation of such endangered and threatened species." 16 U.S.C. § 1531(b). Through

8  the ESA, Congress declared its policy "that all Federal departments and agencies shall

9  seek to conserve endangered and threatened species and shall utilize their authorities in

10  furtherance of the purposes of [the act]." *Id.* § 1531(c)(1).

11       29.     The ESA defines "conserve" as "the use of all methods and procedures

12  which are necessary to bring any endangered species or threatened species to the point at

13  which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. §

14  1532(3). Accordingly, the goal of the ESA is not only to temporarily save endangered

15  and threatened species from extinction, but also to recover these species to the point

16  where they are no longer in danger of extinction, and thus no longer in need of ESA

17  protection.

18       30.     Pursuant to the ESA, a species is listed as "endangered" if it is "in danger

19  of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species

20  is listed as "threatened" if it is "likely to become an endangered species within the

21  foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

22

11

31.     An important benefit the ESA conveys to listed species to prompt their recovery is the "designation" of protected "critical habitat." *Id.* § 1533(a)(3)(A)(i). Areas designated as critical habitat are "essential" to the "conservation of the species." *Id.* § 1532(5)(A).

32.     As a key tool to achieve the Act's conservation objectives, ESA section 7(a)(2) imposes on federal agencies such as USFS a duty to ensure that actions they authorize or carry out are not likely to jeopardize listed species or destroy or adversely modify critical habitat designated for such species. 16 U.S.C. § 1536(a)(2). An agency action "jeopardizes" a protected species if it "reasonably would be expected, directly or indirectly," to reduce appreciably the species' likelihood of survival or recovery "by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 932 (9th Cir. 2008).

33.     Section 7(a)(2) requires that, before undertaking or authorizing an action that may affect ESA-listed species or their critical habitat, USFS must consult with the appropriate expert fish and wildlife agency, which is FWS in the case of terrestrial species such as those involved in this case. *See* 16 U.S.C. § 1536(a)(2)–(3); 50 C.F.R. § 402.01(b). To initiate such consultation, agencies considering an action that may affect ESA-listed species or their critical habitat must prepare a Biological Assessment ("BA") to "determine whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a). The BA process begins with a request from the action agency to FWS for information concerning whether any listed species or critical habitat is

present in the project area. 16 U.S.C. § 1536(c)(1). After FWS provides this information, the action agency then determines, in the first instance, whether any listed species or critical habitat is likely to be affected by the proposed action. *See id.* The BA cannot "entirely fail[] to consider an important aspect of the problem," *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1148 (D. Mont. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), or overlook "relevant factors." *Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1079–80 (D. Mont. 2013) (quoting *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir. 2003)).

34.     If the BA concludes that the agency action will have no effect on ESA-listed species or their critical habitat, then "the consultation requirements are not triggered." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994). If the BA concludes that the agency action may affect, but is not likely to adversely affect, ESA-listed species or their critical habitat, and FWS concurs in writing with that conclusion, then the ESA consultation process is terminated and no further action is necessary. 50 C.F.R. §§ 402.13(c), 402.14(b)(1). Otherwise, where the BA concludes that the agency action may affect an ESA-listed species or its critical habitat, the ESA requires formal consultation under ESA section 7(a)(2). 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

35.     The ESA section 7(a)(2) formal consultation process culminates in FWS's issuance of a biological opinion ("BiOp"), reflecting FWS's determination whether the proposed action will likely jeopardize an ESA-listed species or destroy or adversely

13

modify its critical habitat. 16 U.S.C. § 1536(a)(2), (b)(3)(A); *see* 50 C.F.R. § 402.14. The BiOp must review all relevant information and evaluate the effects of the agency action and its cumulative effects in determining whether the action will jeopardize an ESA-listed species or destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(1)-(4). Under the ESA, "cumulative effects" means "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

36.    In fulfilling the requirements of section 7(a)(2), FWS and USFS must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). This requirement "prohibits an agency from disregarding available scientific evidence that is in some way better than the evidence it relies on." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (cleaned up) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)). Also, in making the determinations required by ESA section 7(a)(2), FWS must "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1121 (9th Cir. 2012) (quotation omitted).

37.    If FWS concludes in its BiOp that a proposed action is likely to jeopardize an ESA-listed species or destroy or adversely modify its critical habitat, the action may not proceed. *See* 16 U.S.C. § 1536(a)(2). FWS must determine whether "reasonable and prudent alternatives" exist that would avoid such harmful outcomes. *Id.* § 1536(b)(3)(A).

14

38.     If FWS concludes in its BiOp that implementing a proposed action (or a

reasonable and prudent alternative) will not jeopardize an ESA-listed species or destroy

or adversely modify its critical habitat, but will nevertheless result in "take" of such

species, the agency must issue an incidental take statement with its biological opinion. 50

C.F.R. § 402.14(i). Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any

such conduct." 16 U.S.C. § 1532(19). "Harm" under this definition "may include

significant habitat modification or degradation where it actually kills or injures wildlife

by significantly impairing essential behavioral patterns, including breeding, feeding or

sheltering." 50 C.F.R. § 17.3. A BiOp's incidental take statement must specify the impact

of such incidental taking on the species and the reasonable and prudent measures that

FWS deems necessary or appropriate to minimize such impact, as well as the terms and

conditions necessary to implement such measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §

402.14(i)(1)(i)–(ii), (iv). Any taking that complies with the terms and conditions of such

an incidental take statement is exempt from the prohibitions on such taking that otherwise

generally apply under the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

## II.    The National Environmental Policy Act

39.     NEPA is our country's fundamental environmental charter. NEPA has

"twin aims." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

First, it requires each federal agency "to consider every significant aspect of the

environmental impact of a proposed action. Second, it ensures that the agency will inform

the public that it has indeed considered environmental concerns in its decisionmaking

process." *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (citation and internal quotation marks omitted).

40.    To that end, NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must describe the underlying purpose and need for the proposed action and objectively evaluate all reasonable alternatives that are consistent with the identified purpose and need. 40 C.F.R. §§ 1502.13, 1502.14(a). The EIS must also evaluate a no-action alternative and all reasonably available measures to mitigate adverse environmental impacts. *Id*. § 1502.14(c), (e).

41.    If an agency believes a proposed action is unlikely to have significant environmental effects, or if an agency is unsure whether a proposed action will have significant environmental effects, it may instead prepare a less exhaustive environmental assessment ("EA") of the proposed action, its impacts, and its alternatives. *Id*. § 1501.5. NEPA requires that, in preparing such an EA, an agency must take "a 'hard look' at the likely effects of the proposed action." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916 (9th Cir. 2012) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005)). "If substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (emphasis in original).

42.    NEPA defines "effects" to include the direct, indirect, and cumulative effects of proposed actions. *See* 40 C.F.R. § 1508.1(g); *see also id*. §§ 1508.7–1508.8 (2019) (for NEPA processes begun before the 2020 revision of these regulations). Under NEPA, cumulative effects are "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions," regardless of who undertakes those actions. *Id*. § 1508.1(g)(3). The terms "effects" and "impacts" are synonymous for NEPA purposes and include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social, or health [effects]." *Id*. § 1508.1(g).

43.    If an agency concludes through an EA process that no EIS is required because the proposed action will not significantly affect the environment, it must issue a "finding of no significant impact," or "FONSI," explaining the basis for that determination. *Id*. § 1501.6. NEPA permits an action agency to justify a FONSI by adopting measures to mitigate a proposed action's adverse environmental impact. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733–34 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). To justify such a finding, however, "the proposed mitigation measures must be developed to a reasonable degree" and supported by "analytical data." *Id.* at 734 (cleaned up).

44.    After an agency has prepared an EIS or EA, the agency must issue a supplement to those analyses if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40

17

C.F.R. § 1502.9(c)(1)(ii) (2019); *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 n.2 (9th Cir. 2000). This continuing agency obligation includes a "duty to gather and evaluate new information relevant to the environmental impact of its actions." *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023 (9th Cir. 1980). This duty applies (1) "[i]f there remains major Federal action to occur," and (2) "if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989) (cleaned up). An agency cannot ignore "new information that may alter the results of its original environmental analysis." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000).

45.    Although "nowhere mentioned in NEPA or in the regulations implementing NEPA," agencies sometimes employ a document called a "supplemental information report," or "SIR," "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." *Idaho Sporting Congress Inc.*, 222 F.3d at 565–66. However, "once an agency determines that new information is significant, it must prepare a supplemental EA or EIS; SIRs cannot serve as a substitute." *Id.* at 566. Moreover, an agency's SIR must take a "hard look" at new information, including new information concerning cumulative impacts, to rationally inform the agency's determination whether a supplemental EA or EIS is required. *Friends of the Clearwater*, 222 F.3d at 561; *Sierra Club v. Bosworth*, 465 F. Supp. 2d 931, 940 (N.D. Cal. 2006).

18

46.     In narrow situations, neither an EIS nor an EA is required and federal agencies may invoke a "categorical exclusion" ("CE") from further NEPA analysis or documentation. *See id.* § 1501.4. Categorical exclusions are appropriate only for categories of actions that the agency has previously determined "normally do not have a significant effect on the human environment." *Id.* § 1508.1(d); *see also id.* § 1501.3(a)(1). Even if an agency determines that a CE covers a proposed action, the agency must still "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." *Id.* § 1501.4(b); *see also Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 741 (10th Cir. 2006) (referring to the "extraordinary circumstances" language as a "safety-valve"). Otherwise, the agency "shall prepare an environmental assessment or environmental impact statement, as appropriate." 40 C.F.R. § 1501.4(b)(2). When relying on a CE, an agency "must supply a convincing statement of reasons why potential effects are insignificant." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) (citation and internal quotation marks omitted).

47.     In 2020, and again in 2022, the U.S. Council on Environmental Quality ("CEQ") revised its NEPA regulations. *See* National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23,453 (Apr. 20, 2022); Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). Because the NEPA process for the Sunnyside Project began before September 14, 2020, the previous regulations apply with respect to that Project. *See* 40 C.F.R. § 1506.13; *see also* Celeste Kinsey, District Ranger, Scoping Notice, Aug. 19, 2019; U.S. Forest Serv., Sunnyside Exploration Drilling

19

Project: Draft Environmental Assessment 6 (Mar. 2021) ("Sunnyside Draft EA") ("This analysis and NEPA documentation is being prepared pursuant to the 1978 implementing regulations.").

48.    Congress amended NEPA in the Fiscal Responsibility Act of 2023, which became effective June 3, 2023. *See* Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023). Nothing in this amendment indicates that Congress meant to apply it to NEPA processes conducted before its enactment, such as those at issue here, *see id.*, and it should not be construed to apply to such processes given that Plaintiffs and other parties relied on the NEPA provisions in effect during these processes to guide their participation, *see Bahr v. Regan*, 6 F.4th 1059, 1069 (9th Cir. 2021) (recognizing "presumption against retroactivity" where retroactive statutory application would "affect[] reliance interests"). In any event, even if the amendment were applied to this case, it does not modify the NEPA legal duties at issue. *See, e.g.*, § 321(a), (b), 137 Stat. at 38-39 (requiring that agencies must prepare an EIS for actions posing "a reasonably foreseeable significant effect on the quality of the human environment," must prepare an EA "if the significance of such effect is unknown," and must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document").

## III.    The Administrative Procedure Act

49.    The Administrative Procedure Act (APA) provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

50.     The APA further provides that "[t]he reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed; and . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id*. § 706(1), (2)(A), or which have been taken "without observance of procedure required by law." *Id*. § 706(2)(D).

## FACTUAL BACKGROUND

### I.     The Patagonia Mountains

51.     The Patagonia Mountains are a range running north from the Mexican border for fifteen miles. Roughly 50 miles southeast of Tucson, Arizona, the Patagonia Mountains are located within the Coronado National Forest. They are a "sky island" mountain range, meaning they are set apart from other mountain ranges and are ecologically quite different from the lowland environments that surround them. The Patagonia Mountains rise up, strikingly, from a surrounding sea of desert.

52.     The mountains are characterized by steep slopes and canyons with rugged cliff faces and rocky outcrops at higher elevations, as well as gently sloping hills and drainages at lower elevations. Evergreen oaks and junipers dot the area, along with various shrubs and succulents. Drainages in the area support riparian deciduous forest communities. The climate of this area is known for warm, wet summers and mild winters with only occasional snow.

53.     The Patagonia Mountains contain the tributaries of Sonoita Creek, including Alum Gulch and Harshaw Creek, waterways that provide essential water to

21

downstream ecosystems and human communities. An unnamed ephemeral tributary of Alum Gulch flows through steep-walled Humboldt Canyon, which holds some of the area's most valuable wildlife habitat. The Patagonia Mountains' creeks and their watersheds are recharge areas for groundwater aquifers. Residents of the Town of Patagonia, as well as approximately 300 individuals in the surrounding communities, depend entirely on the water supply originating in these mountains.



**Figure 1**. Humboldt Canyon, within the Sunnyside project area. Photograph by Laiken Jordahl, June 15, 2023.

## II.    Endangered and Threatened Species in the Area

54.    The Patagonia Mountains are a region of tremendous biodiversity. Many ESA-listed species reside in the Patagonias, including the endangered Gila topminnow, Sonoran tiger salamander, Pima pineapple cactus, Huachuca water-umbel, beardless chinchweed, and the threatened Chiricahua leopard frog, Bartram's stonecrop, and Mexican gartersnake.

55.     The Patagonia Mountains also provide occupied habitat for the ESA-listed Mexican spotted owl. The Mexican spotted owl (*Strix occidentalis lucida*) is one of the largest owls in North America. The owls' geographic range extends from the Rocky Mountains and the Colorado Plateau in the north to the Mexican Plateau in the south. Throughout its range, the owl's roosting and nesting habitat is generally associated with mature and old-growth forests or rocky canyons. Mexican spotted owls exhibit high fidelity to their home ranges, although they forage and roam widely, gradually moving downslope for the winter. Their population appears to have been declining for decades, due in part to mining. In 1993, FWS listed the Mexican spotted owl as "threatened" under the ESA. Endangered and Threatened Wildlife and Plants; Final Rule To List the Mexican Spotted Owl as a Threatened Species, 58 Fed. Reg. 14,248 (Mar. 16, 1993). In 2004, FWS designated 8.6 million acres of critical habitat for the owl, including areas within the Patagonia Mountains. 69 Fed. Reg. 53,182, 53,216 (Aug. 31, 2004). The project area for the Sunnyside Project falls entirely within the owls' designated critical habitat. In addition, FWS's 2012 Mexican Spotted Owl Recovery Plan called for designation of Protected Activity Centers ("PACs") encompassing at least 600 acres surrounding known nesting and roosting sites for Mexican spotted owls, and called for application of conservation measures within such PACs to protect owl habitat. U.S. Fish & Wildlife Serv., Mexican Spotted Owl Recovery Plan, First Revision VIII (Sept. 5, 2012). Such PACs were intended to protect activity centers used by owls rather than their entire home ranges.

56.     The Western yellow-billed cuckoo (*Coccyzus americanus occidentalis*) is a slender migratory songbird that lives in forests across the western United States, mainly in Arizona, California, and New Mexico. In spite of its ostentatious tail and distinctive call, the cuckoo is often difficult to detect, as it conceals itself in dense foliage. Historically, the cuckoo was a "common nester," but by the 1980s fewer than 200 pairs remained in Arizona. *Western Yellow-billed Cuckoo*, NAT'L PARK SERV., https://www.nps.gov/articles/western-yellow-billed-cuckoo.htm (last updated Feb. 4, 2015). In 2014, FWS listed the cuckoo as "threatened" under the ESA. Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Western Distinct Population Segment of the Yellow-billed Cuckoo (Coccyzus americanus), 79 Fed. Reg. 59,992 (Oct. 3, 2014). Although they remain rare, cuckoos nest and breed throughout the Patagonia Mountains. Their nesting and breeding habitat generally encompasses riparian woodlands below 7,000 feet in elevation, but—as recent surveys have documented—in southern Arizona also includes ephemeral and intermittent drainages as well as upland areas. In 2021, FWS designated approximately 298,845 acres of critical habitat for the cuckoo, including areas within the Patagonia Mountains. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Western Distinct Population Segment of the Yellow-Billed Cuckoo, 86 Fed. Reg. 20,798 (Apr. 21, 2021).

57.     The North American jaguar (*Panthera onca*) is a large and secretive cat species with a distinctively marked coat featuring pale yellow to tan colored fur covered by spots that transition to rosettes on the sides. Historically, jaguars appear to have lived

across the southern United States, but by the mid-twentieth century they had been nearly

extirpated from their U.S. range due to human persecution. In the years that followed,

jaguars were spotted only intermittently in the United States, and only in the southwest.

In 1972, FWS listed the jaguar as "endangered." List of Endangered Foreign Fish and

Wildlife, 37 Fed. Reg. 6,476 (Mar. 30, 1972). In the last quarter-century, however,

several jaguars have been spotted in southern Arizona, presumably having migrated from

Mexico back into their historic territory. In 2012 and 2013, and then again in 2016, a

male jaguar known as El Jefe was spotted in the Santa Rita Mountains, just miles

northeast from the Patagonia Mountains. He was the only jaguar known to primarily

reside in the United States, although others have since been documented. In 2014, in part

due to such sightings, FWS designated the Patagonia Mountains as critical habitat for

jaguars, along with the nearby Santa Rita, Empire, and Huachuca Mountains and the

Grosvenor and Canelo Hills. Endangered and Threatened Wildlife and Plants;

Designation of Critical Habitat for Jaguar, 79 Fed. Reg. 12,572, 12,593 (Mar. 5, 2014).

Since 2016, two additional jaguars have been detected near the Patagonia Mountains,

including one as recently as 2023.

     58.    Because jaguars roam widely, the Patagonia Mountains are vital to their

recovery; FWS has determined that these mountains likely constitute a jaguar movement

corridor, one of the few places where jaguars can cross the border to and from Mexico.

FWS has further determined that maintaining the integrity of this movement corridor is

important for improving the viability of the jaguar species in southern Arizona. FWS also

has noted that "connectivity between expansive open areas of habitat for the jaguar in the

United States is necessary if viable habitat for the jaguar is to be maintained,"
Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for
Jaguar, 79 Fed. Reg. at 12,607, and, because jaguars depend on remote regions with
minimal human contact, mining activity "may render an area unsuitable to jaguars." *Id*. at
12,588; *see id*. at 12,573. Historically, human activity in the Patagonia Mountains has
been deadly for jaguars, with several killed in the area since 1904. David E. Brown &
Carlos A. Lopez Gonzales, *Borderland Jaguars: Tigres de la Frontera* 6 tbl. 1 (2001).

59.     Ocelots (*Leopardus pardalis*) are a medium-sized spotted cat species.
Historically, ocelots ranged throughout the southwest, but today fewer than 100 remain in
the United States. In 1972, FWS listed the ocelot as "endangered." List of Endangered
Foreign Fish and Wildlife, 37 Fed. Reg. 6,476 (Mar. 30, 1972); *see also* Endangered and
Threatened Wildlife and Plants; Endangered Status for U.S. Population of the Ocelot, 47
Fed. Reg. 31,670 (July 21, 1982). Although ocelots are famously difficult to detect, and
their presence in the Patagonia Mountains has not been systematically monitored, it is
likely that—like jaguars—they rely on the Patagonia Mountains for travel. Also, as with
the jaguar, FWS has determined that the Patagonia Mountains likely constitute a dispersal
corridor for ocelots moving from Mexico into the United States, and that maintaining this
corridor is important to improving the viability of the ocelot species in the United States.
An ocelot was photographed in the Patagonia Mountains in 2012, and several others have
recently been photographed in the nearby Santa Rita Mountains. Like jaguars, ocelots
rely on broad, open areas with minimal human presence, conditions that are likely to be
disrupted by mining projects.

### III.    The Sunnyside Project

60.    On April 1, 2011, Regal Resources USA, Inc. ("RR"), submitted a Plan of Operations to USFS, proposing a mineral exploration drilling project in the Humboldt Canyon area of the Patagonia Mountains, within the Coronado National Forest.

61.    In the 2011 Sunnyside Plan, RR proposed to drill up to three holes at five drill sites (for a total of up to fifteen holes). In total, the Plan estimated that the Project would disturb approximately 1.42 acres of surface land, through the development of drill pads, catchment ponds, and road repair.

62.    In time, however, RR revised its plan and the proposed Sunnyside Project ballooned. Ultimately, RR proposed to drill 24 hours per day, 7 days per week, at six drill sites in the same area. Five of the drill sites would be 15 feet by 90 feet; the sixth would be 50 feet by 75 feet. To enable this activity, RR would bring considerable equipment into the Patagonia Mountains, including drilling rigs, backhoes, road graders, dozers, trucks, water pumps, and chainsaws. Drilling at night would require artificial lighting. RR anticipated the project being complete in one year, with drilling occurring for at least six months (two months at each location with two sites being drilled at a time), with a break in operations from March 1 through September 30 to avoid the Mexican spotted owl breeding season and the local activity period of the Western yellow-billed cuckoo. Reclamation, invasive weed control, and erosion control would not be completed for up to three years.

63.    Over the next several years, as part of the NEPA process, PARA (a Plaintiff in the present action) and another conservation organization provided comments to

USFS, explaining the significant environmental impacts that the then-proposed

Sunnyside Project would cause. Nevertheless, on September 12, 2014, USFS published a

Decision Memorandum approving the Sunnyside Project and categorically excluding it

from further NEPA analysis. In reaching this decision, USFS concluded the Project

would be completed within one year and that no extraordinary circumstances—such as

impacts to threatened or endangered species or cumulative impacts—precluded the

agency's use of a categorical exclusion.

64.    On October 29, 2014, PARA challenged that decision by bringing suit

against USFS (among other defendants) in this Court, alleging violations of NEPA and

the APA. Shortly thereafter, in response to the listing of the Western yellow-billed

cuckoo and new information about the Project's potential effects on ESA-listed species,

FWS withdrew its concurrence and reinitiated consultation with USFS under the ESA.

On January 9, 2015, following a motion for preliminary injunction filed by plaintiffs in

the PARA litigation, USFS withdrew its Decision Memorandum. The parties jointly

moved for a stay of litigation to allow USFS and FWS to complete the reinitiated

consultation, which the Court ordered.

65.    On April 8, 2015, USFS published a new Decision Memorandum, again

approving the Sunnyside Project and categorically excluding it from further NEPA

analysis. In reaching this decision, USFS again concluded the Project would be

completed within one year and that no extraordinary circumstances—such as impacts to

threatened or endangered species or cumulative impacts—precluded the agency's use of a

categorical exclusion.

28

66.     On May 27, 2015, PARA amended its previous complaint, alleging violations of NEPA and the APA. Four months later, this Court granted summary judgment in favor of PARA, concluding that USFS's reliance on a categorical exclusion was arbitrary and capricious because the Sunnyside Project could not be completed within one year, due to the six-month non-operational period (to allow for Mexican spotted owl and Western yellow-billed cuckoo breeding seasons) and the three-year period for reclamation and revegetation. *Defenders of Wildlife v. U.S. Forest Serv.*, No. CV-14-02446-TUC-RM, slip. op. at 6–8 (D. Ariz. Sept. 15, 2015). This Court further ruled that USFS's extraordinary-circumstances analysis underlying the categorical exclusion was "undermined" by the Service's failure to "provide a convincing explanation" as to why the negative effects of light and noise on the Mexican spotted owl "are certain to be environmentally insignificant." *Id*. at 12–13, 16. Finally, this Court ruled that USFS's reliance on a categorical exclusion violated NEPA due to the Service's failure to analyze the cumulative effects of the Sunnyside Project together with other, nearby mineral exploration projects on National Forest land, including an adjacent private-land drilling project called the Hermosa project, at the Trench Camp tract of private property within the same general area of the Patagonia Mountains ("Hermosa Project"). *Id*. at 13–16.

67.     In the years that followed, RR transferred options on the Sunnyside Project to Barksdale Capital Corporation ("Barksdale"), a Canadian metals exploration company. In 2019, Arizona Standard, LLC ("AS")—an Arizona-based corporation that is a subsidiary of Barksdale—submitted a Plan of Operations to USFS, proposing a further

29

revised—and substantially enlarged—version of the Sunnyside Project. FWS characterized the "new proposed mineral exploration project" as being sited at "a location similar to the prior Sunnyside Exploratory Drilling Project." U.S. Fish & Wildlife Serv., Biological Opinion 2 (Dec. 1, 2022) ("Sunnyside BiOp"). "The main difference between the prior and current proposed actions was an increase in drill pads, duration, and changes to the previous proposed project's Mexican spotted owl conservation measures." *Id*. In 2021, and then again in 2022, AS submitted further revised Plans of Operations.

68.    In the most recent Sunnyside Plan, as in earlier iterations of the Plan, AS proposed to drill 24 hours per day, 7 days per week. Now, however, AS proposed to construct up to 30 drill pads and drill over seven years, with reclamation to continue for an eighth year and reclamation monitoring for up to six years thereafter. To accomplish this proposed development, a fleet of heavy-duty vehicles would access the Project area along several existing roads, including Flux Canyon Road, and AS would widen a number of these, including Flux Canyon Road. A portion of the project would occur within the sensitive biodiversity stronghold of Humboldt Canyon. In total, AS estimated the Project would disturb approximately 10.06 acres of surface land. However, this acreage encompasses only the project's area of ground disturbance and does not reflect that it proposes noise and disturbance extending far beyond the project's physical disturbance boundaries.

69.    AS noted it would halt drilling and other construction activities "within the core area of a Mexican spotted owl PAC from March 1 through August 31 unless it has been determined that the PAC is unoccupied or the owls are not nesting that year, as

inferred from results of surveys conducted according to protocol." U.S. Forest Serv., Plan of Operations: Sunnyside Exploration Drilling Project 47 (Dec. 19, 2022) ("2022 Sunnyside Plan"). Accordingly, the project proposal contemplated development activity within known nesting and roosting areas for Mexican spotted owls, including within the heart of their activity areas unless nesting was documented.

70.    The equipment that AS would operate in the Patagonia Mountains for this Project include an excavator, bulldozer, loader, road grader, two dump trucks, a tractor, three water trucks, a service/fuel truck, four tractor-trailer trucks, six pickups, fifteen 3,500-gallon water storage tanks, and multiple chainsaws, water pumps, diesel generators, and portable toilets. Drilling at night would require artificial lighting.

71.    As USFS has acknowledged, the ground disturbance, noise, dust, presence of drill rigs, and increased vehicle traffic would amount to a "change in scenery" that "may affect residents, business owners, and visitors' expectations of the Coronado National Forest and the local historic rural landscape." U.S. Forest Serv., Sunnyside Exploration Drilling Project: Environmental Assessment 7 (Jan. 2023) ("Sunnyside EA"). The drilling would take place on designated critical habitat for jaguars, Western yellow-billed cuckoos, and Mexican spotted owls, including in five areas designated as Protected Activity Centers for Mexican spotted owls that are intended to sustain and enhance owl breeding.



**Figure 2**. Sunnyside Project map. From U.S. Forest Serv., Sunnyside Exploration Drilling Project: Environmental Assessment 80 (Jan. 2023).

72. The drill sites for the Sunnyside Project would be within the drainage of Alum Gulch, which drains into Sonoita Creek. Historic mining operations in the

Patagonia Mountains have led to concerning levels of lead, copper, arsenic, fluoride, and acidity in Alum Gulch and Sonoita Creek, which provide the water supply for the Town of Patagonia. Pursuant to the federal Clean Water Act, Alum Gulch is subject to an EPA-approved Total Maximum Daily Load calculation for cadmium, copper, zinc, and acidity, while Sonoita Creek is a state-designated impaired waterway for aquatic life and wildlife uses as a result of zinc contamination.

### IV.    Agency Efforts to Comply with ESA: Sunnyside Project

73.    Pursuant to the requirements of the ESA, *see* 16 U.S.C. § 1536(a)(2), (c)(1), USFS prepared a BA of the Sunnyside Project. Drawing on FWS's official species list, the BA considered impacts on Mexican spotted owls, Western yellow-billed cuckoos, jaguars, ocelots, and a rare plant species known as Bartram's stonecrop. The BA determined that the Project "may affect, and is likely to adversely affect" the Western yellow-billed cuckoo, the ocelot, the jaguar and its designated critical habitat, and the Mexican spotted owl and its designated critical habitat. U.S. Forest Serv., Biological Assessment for Sunnyside Exploration Drilling Project 5-17, 5-26, 5-33 (Aug. 2020) ("Sunnyside BA"). The BA determined that the Project "is not likely to jeopardize the continued existence of Bartram's stonecrop." *Id*. at 5-36.

74.    On August 6, 2020, USFS communicated its determinations to FWS. In response, FWS prepared a BiOp, which it finalized on December 1, 2022. FWS determined that the Project "is not likely to jeopardize the continued existence" and is not likely to "destroy or adversely modify critical habitat" of the Mexican spotted owl, Western yellow-billed cuckoo, jaguar, and ocelot. Sunnyside BiOp at 19–20, 38–39, 58,

33

62. FWS anticipated that the Project would result in incidental take of the Western yellow-billed cuckoo, jaguar, and ocelot, but exempted USFS's approval of the Project from the ESA's take prohibition subject to several terms and conditions. Although FWS also anticipated that the Project would result in incidental take of the Mexican spotted owl, FWS exempted USFS's approval of the Project from the ESA's take prohibition for owls without providing any terms or conditions or reasonable and prudent measures to minimize or mitigate the project's impact.

**V.    Agency Efforts to Comply with NEPA: Sunnyside Project**

75.    On March 2, 2021, USFS published a Draft EA for the Sunnyside Project. USFS solicited public comment on the Draft EA, and Plaintiffs timely submitted comments. Plaintiffs wrote that the Draft EA "is legally and factually inadequate," providing USFS with extensive information as to the document's errors and omissions. Ron Robinson et al., Comments on Draft EA, Sunnyside Exploration Drilling Project, Apr. 2, 2021, at 3 ("Robinson Comments"). Among other points, Plaintiffs noted that the draft EA had systematically undercounted risks to the ESA-listed species in the area, failed to consider the cumulative impacts of the many drilling and mining projects operating and anticipated in the vicinity, and failed to take measures to safeguard their water, including undertaking an analysis of baseline water conditions.

76.    Almost two years later, USFS responded to the comments it had received regarding the Draft EA. The agency repeatedly averred in conclusory fashion that its responses to many of Plaintiffs' concerns were "described in the EA" or "summarized in the EA." U.S. Forest Serv., Sunnyside Exploration Drilling Project, Response to

Comments from the Draft Environmental Analysis 60, 64, 65, 67, 68, 69, 70, 71, 74, 94, 95 (Jan. 2023) ("Sunnyside Response to Comments").

77.     In January 2023, USFS published its Final EA, Draft FONSI, and Draft Decision Notice ("DN") approving the Sunnyside Project.

78.     On March 10, 2023, pursuant to 36 C.F.R. §§ 218.8–218.9, Plaintiffs timely filed Objections with USFS. Plaintiffs informed USFS that the Draft Decision Notice "is based on an inadequate EA and FONSI . . . . The remedy for these violations is for the Forest Service (USFS) to withdraw the DN, EA, and FONSI and not issue any decision or take any action based on the inadequate EA." Roger Flynn et al., Objection to the Sunnyside Exploration Drilling Project, Draft Decision Notice (DN), Finding of No Significant Impact (FONSI) and Final Environmental Assessment (EA), Mar. 10, 2023, at 1 ("Flynn Objections"). Plaintiffs noted that USFS must instead prepare an EIS. *Id*. at 3.

79.     Among many other objections, Plaintiffs informed USFS that the EA failed to adequately account for the risks to ESA-listed species (e.g., Mexican spotted owls, Western yellow-billed cuckoos, jaguars, ocelots, etc.) and water; assumed without scientific basis the absence of ESA-listed species; assumed without scientific analysis that certain risks were trivial; failed to conduct an adequate cumulative effects analysis; and failed to identify appropriate mitigation measures. All of these were objections that Plaintiffs had previously raised in their comments on the Draft EA except to the extent that certain objections to the final EA were based upon USFS's reliance on the FWS

BiOp, which had not been prepared at the time Plaintiffs' Draft EA comments were due

and thus was not available to Plaintiffs or a subject of USFS reliance at that time.

80.     On May 25, 2023, USFS responded to Plaintiffs' Objections, concluding

that the agencies had not violated NEPA or other laws or regulations. Letter from Kurt

Davis, Deputy Forest Supervisor, U.S. Dep't of Agric., to Roger Flynn, Western Mining

Action Project, May 25, 2023, at 2 ("Davis Response"). USFS dismissed numerous

Objections, insisting the agency had "considered" Plaintiffs' suggestions, *see, e.g.*, *id*. at

appx. A, 4, or "properly analyzed" the science, often without addressing the substance of

Plaintiffs' Objections. *See id*. at appx. A, 12, 14. In response to several Objections, USFS

insisted that "[t]he objector does not have standing on th[e]s[e] contention[s]" because

Plaintiffs had allegedly failed to raise such arguments previously during the comment

period on the Draft EA. *Id*. at appx. A, 22, 24, 25, 26. USFS published its final

DN/FONSI on June 16, 2023.

81.     On September 7, 2023, USFS issued its approval of the plan of operations

for the Sunnyside Project.

82.     Until that USFS approval of the plan of operations, the Sunnyside Project

could not commence on federal public lands. Pursuant to USFS mining regulations that

govern the Sunnyside Project, "operations can not be conducted until a plan of operations

is approved." 36 C.F.R. § 228.4(a)(4).

## ERRORS IN THE ESA PROCESS

83.     The Forest Service's approval of the Sunnyside Project authorizes the

development of as many as 30 mineral exploration wells with associated road and well

36

pad construction over seven years within the most environmentally sensitive portion of one of the highest-value wildlife habitats in the American southwest. The Project would disrupt the project area and surrounding lands with a constant disturbance of noise, lights, dust, human activity, and vehicle traffic. These impacts threaten to drive Mexican spotted owls and Western yellow-billed cuckoos from established breeding and foraging territories, and to disrupt the ability of jaguars and ocelots to occupy the area or utilize its habitat to successfully move from Mexico into their historical range in the United States. The development also would take place in an area where other projects that are ongoing and anticipated will only add to the cumulative level of disturbance.

84.     Nevertheless, in assessing the impacts of the Project to sensitive and imperiled owls, cuckoos, jaguars, and ocelots, both USFS and FWS acted arbitrarily, misread or ignored applicable scientific and commercial information, and overlooked significant risks to the ESA-listed species of the Patagonia Mountains.

**I.    Failure to Use Best Available Science Regarding Owl Impacts**

85.     First, FWS failed to "use the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), in addressing the Sunnyside Project's threat of injury to Mexican spotted owls. As a result, FWS arbitrarily minimized the Project's impact to Mexican spotted owls and issued irrational and unlawful no-jeopardy and no-adverse-modification conclusions for this species. USFS acted arbitrarily in relying on FWS's flawed BiOp.

86.     In its BiOp, FWS dismissed the potential for the chronic noise of the Sunnyside Project to injure Mexican spotted owls. In reaching this conclusion, FWS misread the scientific study on which it relied and wholly ignored several other relevant

studies. Specifically, FWS's BiOp concluded that noise levels from the Sunnyside Project would "attenuate below the threshold for injury of owls"—which it identified as 92 dBA (weighted decibels)—"at approximately 100 feet from any drill area or area of heavy equipment use." Sunnyside BiOp at 35. FWS further concluded that "[o]wls experiencing short-term harm" from Project operations "may fail to successfully rear young or may depart in one or more breeding seasons, but will not likely permanently desert the area because of the disturbance." *Id.* at 40. In reaching both of these central conclusions about the extent of project impacts, FWS relied exclusively on one scientific study: David K. Delaney et al., Effects of Helicopter Noise on Mexican Spotted Owls, 63 J. WILDLIFE MGMT. 60 (1999) ("Delaney (1999)").

87.    On its face, however, the Delaney study supported neither of these conclusions. At the outset, Delaney (1999) identified the 92 dBA noise level cited by FWS only as the threshold for Mexican spotted owls to flush and fly away in response to helicopter disturbance, *see* Delaney (1999) at 68, not as an all-encompassing "threshold level for injury of owls," as the BiOp claimed. BiOp at 35. In fact, Delaney (1999) identified a much lower noise threshold—46 dBA—for the owls' flushing response to chainsaw disturbance, which it deemed to validate "the already established pattern that ground-based activities are typically more disturbing to raptors than aerial activities." Delaney (1999) at 68, 74. FWS in the BiOp did not explain why it determined the Sunnyside Project's threshold noise level for *any* injury to owls based on Delaney (1999)'s higher threshold for aerial helicopter disturbance rather than its lower threshold

38

1    for ground-based chainsaw disturbance, given that Sunnyside Project impacts will result

2    from ground-based construction and drilling activities.

3          88.    Further, Delaney (1999) documented Mexican spotted owls' reactions only

4    to intermittent bursts of less than ten minutes of helicopter disturbance and five minutes

5    of chainsaw disturbance per day—not any kind of long-term disturbance and certainly not

6    the round-the-clock, chronic noise disturbance for up to seven years that the Sunnyside

7    Project threatens. Delaney (1999) at 65. Also, it focused on measuring specific owl

8    responses to these short-term disturbances, including flushing and alert behavior, and

9    offered no evidence about whether owls were likely to "permanently desert the area

10    because of the disturbance," as the BiOp claimed. *Id.* at 60–61; Sunnyside BiOp at 40. It

11    explicitly stated that its findings were specific to the circumstances it studied and

12    "caution[ed] against use of [its] findings to infer how spotted owls would respond under

13    different circumstances that were not directly tested," including more frequent

14    disturbances. Delaney (1999) at 74. FWS ignored these important features of the Delaney

15    study and, in doing so, relied on the study to reach conclusions that were wholly

16    unsupported by that study and defied the express limitations and cautions of the study's

17    authors.

18          89.    FWS also "ignore[d] available biological information" concerning the

19    extent and severity of project impacts on Mexican spotted owls. *Kern Cty. Farm Bureau*,

20    450 F.3d at 1080–81 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

21    Although overlooked by FWS in its BiOp, available studies suggest that the Sunnyside

22    Project's chronic noise is likely to significantly impair Mexican spotted owls' ability to

39

successfully forage by diminishing their ability to hear prey. One study, J. Tate Mason et al., *Anthropogenic Noise Impairs Owl Hunting Behavior*, 199 BIOLOGICAL CONSERVATION 29, 31 (2016) determined that chronic noise levels of 61 dBA so interfered with the hearing of Northern saw-whet owls that the owls were unable to capture any mice at all. Another study, Masayuki Senzaki et al., *Traffic Noise Reduces Foraging Efficiency in Wild Owls*, 6 SCI. RPTS. 30602, 30603 (2016), determined that chronic noise levels of just 40 dBA reduced long-eared and short-eared owls' ability to detect prey, while noise levels of 80 dBA made prey detectability virtually impossible.

90.    These findings are likely to be representative of chronic noise impacts on Mexican spotted owls because, like the owl species involved in the Mason and Senzaki papers, Mexican spotted owls rely heavily upon auditory cues when hunting. These findings therefore indicate that chronic noise impacts from the proposed Sunnyside Project would seriously compromise the affected spotted owls' ability to hunt in the Project area and surrounding vicinity. In fact, the noise attenuation projections for the Sunnyside Project that were utilized in the project BA indicate that, even up to 1,600 feet from drilling and construction equipment, project noise is expected to exceed the 61 dBA threshold that was associated with no owl hunting success in Mason, et al. (2016). *See* Sunnyside BA at 5-2. These attenuation projections further indicate that Project noise is expected to reach Senzaki, et al. (2016)'s documented threshold for impacts on owls' ability to detect prey—40 dBA—as far as 12,800 feet (more than two miles) from the noise source. *Id*. FWS took no account of these impacts.

40

91.     Because of the likelihood that the Sunnyside Project's chronic noise impacts will extensively interfere with the affected Mexican spotted owls' ability to forage throughout a large area surrounding the proposed drilling and construction activity, there is also a high likelihood that the affected owls will permanently abandon territories in the impacted area for at least the full duration of proposed drilling activities (i.e., up to seven years), and potentially longer depending on the extent of disturbance associated with subsequent reclamation activities. FWS failed to consider the impact of project noise on owl foraging in reaching its contrary conclusion that Mexican spotted owls would not likely be permanently driven from the project area.

92.     For its part, USFS relied on the FWS BiOp to satisfy its own ESA obligations regarding the Sunnyside Project, without further analysis. USFS did so despite having received Plaintiffs' Objections that explained the deficiencies in the BiOp's unjustified reliance on Delaney (1999).

## II.    Disregard of Relevant Information About Project Impacts

93.     In addition, both FWS and USFS repeatedly ignored or misconstrued relevant information in reaching their ESA determination that the Sunnyside Project would be unlikely to jeopardize or destroy or adversely modify critical habitat for the Mexican spotted owl, Western yellow-billed cuckoo, jaguar, and ocelot.

94.     In evaluating cumulative effects of the Sunnyside Project, FWS's BiOp repeatedly ignored the "best . . . commercial data available" concerning the Hermosa Project located immediately east of the proposed Sunnyside Project on private land known as the Trench Camp property. 16 U.S.C. § 1536(a)(2). Specifically, FWS ignored

the project proponent's own January 17, 2022, update advising that the Hermosa Project currently involves drilling of two sloped tunnels as a prelude to 22 years of mining production commencing as soon as Fiscal Year 2027. In addition to mine shafts, planned surface developments for the Hermosa Project include a paste plant, processing plant, and dry-stack tailings storage facility. Instead of considering this information—which was available nearly a full year before FWS issued the BiOp—FWS evaluated the Sunnyside Project's cumulative effects with the Hermosa Project based only on a stale media report and omitted key information concerning the scope of the project's threat to listed species and their habitats. USFS equally ignored such information in relying on FWS's flawed BiOp.

95.    FWS and USFS repeatedly relied on affected species' ability to avoid impacts of the Sunnyside Project simply by moving to other locations. These agencies' analyses concluded that Sunnyside would not have adverse effects on ESA-listed species largely because the Project occupies only a small proportion of these species' total habitat and they can simply go elsewhere to avoid project disturbance. Such agency reasoning ignores the threat that, in doing so, these species would then be harmed by ongoing and foreseeable developments occurring simultaneously at numerous nearby sites, including, at minimum, the Hermosa Project.

### ERRORS IN THE NEPA PROCESS

96.    For the same reasons that the ESA demanded a probing analysis of the Sunnyside Project's impacts on ESA-listed species in the sensitive Patagonia Mountains region, NEPA demanded a "hard look" to fully identify these projects' significant

42

impacts on the human environment. Indeed, this Court in the 2015 *Defenders of Wildlife* decision specifically faulted USFS for failing to undertake such an analysis in approving a prior version of the Sunnyside Project that contemplated a smaller project with fewer impacts. Yet instead of taking the "hard look" that NEPA requires, USFS relied on irrational assumptions and unjustified conclusions to discount impacts and sidestep necessary environmental analysis.

## I.    Failure to Consider the Sunnyside Project's Cumulative Impacts

97.    Despite NEPA's demand that an agency consider cumulative impacts, *see* 40 C.F.R. § 1508.7 (2019), USFS failed to adequately consider the effects of the Sunnyside Project together with other mineral exploration projects near the Sunnyside Project area. Many mineral projects are operating, authorized, or planned in the immediate vicinity of the Sunnyside Project, including the ongoing private-land Hermosa Project and the forthcoming public-land Hermosa Critical Minerals Project ("Hermosa CMP"). (The proponent of both projects is South32 Hermosa, Inc.) The Sunnyside project area immediately borders the Hermosa Project and Hermosa CMP locations. Nevertheless, USFS improperly overlooked or inadequately addressed these mineral exploration projects in its cumulative effects analysis.

98.    The Sunnyside EA includes no mention—much less analysis—of the Sunnyside Project's cumulative impact with Hermosa CMP. Nor does the Sunnyside BiOp. Hermosa CMP is a "proposed zinc and manganese mining and processing operation," which "will involve subsurface and surface disturbance of lands within the Coronado Forest." *See South32 Hermosa Critical Minerals Project*, Permitting

1   DASHBOARD (May 5, 2023), https://www.permits.performance.gov/permitting-

2   project/fast-41-covered-projects/south32-hermosa-critical-minerals-project. Hermosa

3   CMP would significantly expand South32's ongoing exploration of patented mine claims

4   (i.e., private property) onto unpatented mine claims (i.e., public lands of the Coronado

5   National Forest administered by USFS). USFS is already forecasting that authorization of

6   Hermosa CMP is likely to move swiftly; it is the first mining project to be added to the

7   Biden administration's FAST-41 fast-track approval process, indicating Hermosa CMP is

8   a high federal priority. Yet, although the EA contains brief mentions of the private-land

9   Hermosa Project, albeit with minimal and inadequate detail or analysis, it contains no

10  mention of its public-land counterpart.

11      99.    Nevertheless, USFS received substantial information about the substance

12  and scope of Hermosa CMP before issuing its approval of the plan of operations for the

13  Sunnyside Project on September 7, 2023. On information and belief, such information

14  included a proposed plan of operations submitted to USFS by the Hermosa CMP

15  developer on August 17, 2023. Plaintiffs have sought to obtain a copy of this proposed

16  plan of operations, including through requests submitted to USFS pursuant to the

17  Freedom of Information Act, 5 U.S.C. § 552. To date, USFS has declined to produce this

18  proposed plan of operations to Plaintiffs in response to such requests.

19      100.   After initiation of this litigation and Plaintiffs' submission to this Court of

20  records demonstrating that USFS received significant information about Hermosa CMP

21  before approving the Sunnyside Project plan of operations, USFS sought to fill the gap in

22  its cumulative impacts analysis through a post-decisional and inadequate review of

limited supplemental information that it undertook outside of the NEPA process. Specifically, USFS announced on August 20, 2024, that it intended to prepare a "Supplemental Information Report" "considering whether new information about the Hermosa Critical Minerals Project requires a supplemental NEPA document." Consent Mot. to Stay Deadlines 1, ECF No. 91. USFS promised to complete this SIR document by October 31, 2024.

101.    To inform USFS's SIR analysis, Plaintiffs submitted a detailed letter, with numerous exhibits, to USFS on September 16, 2024. This letter documented, among other things, significant cumulative impacts to Mexican spotted owls and other imperiled species from the Sunnyside Project and Hermosa CMP, including noise impacts demonstrated by the previously overlooked Mason and Senzaki studies discussed above, as well as evidence that a key mitigation measure that USFS previously relied on to reduce such impacts had proven to be ineffective in its implementation. Plaintiffs also sent a copy of the letter and its exhibits to counsel for the Federal Defendants in this case.

102.    However, when USFS issued its SIR on October 31, 2024, it failed to consider or discuss any such documentation or evidence and instead offered only conclusory assertions that the cumulative impacts of the Sunnyside Project "would not change based on new information" about Hermosa CMP. U.S. Forest Serv., Sunnyside Exploration Drilling Project: Environmental Assessment: Supplemental Information Report (Oct. 2024) (USFS 031159).

103.    In addition to its inadequate treatment and analysis of Hermosa CMP, the EA contains few details and little analysis of the Sunnyside Project's cumulative impact

with the private-land Hermosa Project. The EA described this project as the "[d]evelopment of the 450-acre Trench Camp property immediately to the east of the project area into a full-scale zinc mine." Sunnyside EA at 26 tbl. 8. Likewise, the BA noted that "immediately to the east of the Project area," South32 "is currently conducting exploration activities in preparation for mining . . . as part of their Hermosa Project." Sunnyside BA at 3-1. But such descriptions grossly undersell the sheer size of this nearby project, which South32 expects to have a 22-year timespan and produce 4.3 million metric tons per year. *See Hermosa Project Update*, SOUTH32 (Jan. 17, 2022), https://www.south32.net/docs/default-source/exchange-releases/hermosa-project-update-0x6e16b082af2a4715.pdf?sfvrsn=9a4bb0cc_0. South32 had indicated its intention to start blasting mine shafts and dewatering the summer of 2023. USFS failed to detail, discuss, or consider such cumulative impacts.

104.    These USFS omissions constituted significant oversights in evaluating Sunnyside Project impacts because the Sunnyside NEPA documents repeatedly concluded that Sunnyside would not have significant effects on ESA-listed species in large part because the Project occupies only a small proportion of these species' habitat and they can simply go elsewhere to avoid the construction, drilling, and noise that this Project threatens. For instance, in one key summary passage USFS wrote, "Since the area that would be disturbed by the proposed action at any given time is relatively small, most wildlife species would be able to shift their activities within their home range, which would have less adverse effects than if those species were displaced from their existing home ranges entirely." Davis Response at appx. A, 23. Yet despite relying on affected

species' ability to avoid Project impacts by moving to other locations, at no point did USFS consider where such species will go when development is occurring at Hermosa *and* Sunnyside *and* Hermosa CMP. Had USFS adequately analyzed the cumulative impacts of the many other mineral projects in the vicinity, however, USFS could not have reasonably concluded that ESA-listed species could avoid significant impacts from Sunnyside by simply relocating, and USFS's FONSI could not have been justified.

105.    In sum, USFS ultimately concluded that the drilling, construction, light, noise, dust, and human presence of the Sunnyside Project will not result in significant adverse effects to ESA-listed species, but USFS failed to consider the *cumulative* effects of drilling, construction, light, noise, dust, and human presence in the multiple mineral projects that are ongoing and/or about to proliferate across the Patagonia Mountains area of the Coronado National Forest. The presence of multiple projects not only increases each of these impacts; it reduces the nearby areas to which imperiled species can flee, thus increasing the odds of habitat abandonment. The presence of multiple projects also reduces the overall connectivity of the region, a quality on which jaguars and ocelots depend for recovery—and a quality that is unusually important in the Patagonia Mountains, given the region's role as a rare and vital corridor between Mexico and the United States. *See* Sunnyside BiOp at 56 ("the maintenance of this corridor is important to improving the viability of these species in southern Arizona"); *see also id.* at 62–63. Further, as Plaintiffs pointed out to the agency, Mexican spotted owls and Western yellow-billed cuckoos also depend on connectivity—both are part of interbreeding

1    metapopulations, the behaviors of which will be disrupted by the cumulative presence of

2    multiple mineral projects. USFS failed to consider such factors.

3    **II.    Failure to Adequately Analyze Threats to Groundwater Quality**

4          106.    Contrary to the requirements of NEPA, the Sunnyside environmental

5    assessment failed to take a hard look at the Project's threats to groundwater quality,

6    despite the fact that Project-area waters constitute the drinking-water source for the Town

7    of Patagonia and other nearby residences. The Sunnyside EA acknowledged that key

8    issues raised by the Project included the prospect that "[p]roposed drilling methods could

9    cause conveyance of groundwater between the upper aquifer and subtending intersected

10   aquifers. The water quality of the upper aquifer does not meet State standards and water

11   quality of the subtending aquifers is unknown." Sunnyside EA at 7. Nevertheless, the EA

12   concluded that, with the implementation of specified "design features" and "mitigation

13   measures," "the drilling methods that would be employed would not enhance the flow of

14   groundwater between aquifers." Sunnyside EA at 62; *see also id.* at 92–97. The

15   Sunnyside FONSI relied on these same features and measures to prevent any significant

16   environmental impact from the Project. *See* U.S. Forest Serv., Decision Notice and

17   Finding of No Significant Impact for the Sunnyside Exploration Drilling Project 1–2, 17

18   ("Sunnyside DN/FONSI"). However, this USFS analysis overlooked important

19   information provided by the agency's own expert hydrologist evaluating the Sunnyside

20   Project's package of design features and mitigation measures. In this evaluation, the

21   USFS hydrologist deemed various such features and measures inadequate to prevent

22   potentially significant impacts to water quality arising from groundwater contamination,

48

in part because some of the drilling practices proposed in the Plan of Operations did not include requirements for casing of the borehole during drilling operations to prevent groundwater flow between aquifers. Despite receiving this information from its own expert hydrologist, USFS approved the Plan of Operations without reconciling its analysis with the hydrologist's conclusion or explaining its basis for a contrary conclusion.

107.    For the same reason, USFS further erred in failing to rationally assess the baseline water quality conditions for the Sunnyside Project so that an informed analysis of likely changes in water quality caused by the Project could be conducted. In response to Plaintiffs' objections, USFS acknowledged the absence of baseline groundwater data for the Project area but argued that "detailed information in the Water Resources Report (PR 486, pp. 4–15) provides surrogate information about the affected environment and proximate groundwater conditions that were used to make reasonable predictions about existing conditions in the immediate drilling locations." Davis Response at appx. A, 36. Yet this Report itself acknowledged considerable uncertainty in its discussion of groundwater: "During drilling, the proponent . . . could allow groundwater from the deeper aquifer systems, *about which little is known at this time*, to flow to shallower aquifer systems or to the ground surface." U.S. Forest Serv., Sunnyside Exploration Drilling Project: Water Resource Analysis Technical Report 15 (June 24, 2022) ("Water Resource Report") (emphasis added).

108.    Further, USFS failed to explain why or how the surrogate data adequately accounted for the groundwater quality and quantity in the Project area. The Water

Resource Report relied heavily on a 2001 study of groundwater samples and noted that "[o]nly one of the 20 monitoring wells sampled (CCK-08/09) is located within 3 miles of the project area." *Id.* at 8; *see also* Sunnyside EA at 60 (relying on this same twenty-year-old data). USFS offered no rationale to justify its reliance on twenty-year-old data, most from miles away, to safeguard threatened drinking-water sources in the Project area. Nor did the agency rationally analyze information from the closest monitoring well in its cited study, which exhibited arsenic contamination exceeding the federal drinking-water standard, or information from the Humboldt Well within the Sunnyside Project area, which was contaminated with heavy metals and required remediation for that reason.

109.    USFS ultimately concluded that further analysis of baseline groundwater conditions in the Project area was immaterial because the Project's design features and mitigation measures would prevent flow of groundwater between aquifers. As discussed, however, this conclusion arbitrarily disregarded the agency's own expert evaluation that deemed the Project's package of design features and mitigation measures inadequate to prevent such groundwater movement. Because the Project, as approved, created a significant risk of groundwater movement between aquifers with resulting pollution impacts, rational analysis of baseline groundwater conditions was important for an informed agency decision, but lacking in USFS's Sunnyside Project assessment.

### III.    Failure to Properly Consider Scientific Objections Regarding the Sunnyside Project

110.    Compounding the errors in its environmental analysis, USFS's response to Plaintiffs' objections improperly dismissed serious scientific criticisms in determining

50

that the Sunnyside Project would not have significant adverse environmental effects. In

objections to the DN, EA, and FONSI, Plaintiffs disputed the "repeated

mischaracterizations of a paper by Delaney et al., 1999" in the BiOp and the USFS EA

that depends on it, for the reasons outlined above. Flynn Objections at 25. Relatedly,

Plaintiffs objected to the fact that "[t]he BiOp, EA, and DN make scientifically erroneous

or unfounded assertions about effects of noise and human activity on [Mexican spotted

owls] and by extension [Western yellow-billed cuckoos]." *Id*. at 31. Plaintiffs objected

to inadequate study of cumulative effects on owls, noting, for instance, that "neither the

BiOp nor the EA provides any measure of how disturbance in core areas or non-core

areas outside of the breeding would affect the owls." *Id*. at 24. Plaintiffs objected to the

fact that "[n]either the BiOp, EA, nor DN explains or analyzes reasons for" not requiring

the cessation of drilling during cuckoo breeding season. *Id*. at 30–31. Yet USFS declined

to respond to any of these objections. Instead, USFS insisted that "[t]he objector does not

have standing on th[e]s[e] contention[s]" because Plaintiffs had allegedly failed to

previously raise such arguments in their comments on the Draft EA. Davis Response at

appx. A, 22, 24, 25, 26, 27.

111.    However, each of the objections mentioned in the last paragraph responded

to flaws in the BiOp and the USFS EA's reliance on those flaws. It was not possible for

Plaintiffs to raise such issues in their comments on the Draft EA for the Sunnyside

Project. Plaintiffs submitted their comments responding to the Draft EA on April 3, 2021,

and the comment period concluded on April 5, 2021. The BiOp was released on

December 1, 2022. In commenting on the Draft EA, Plaintiffs could not have raised flaws

1   in the BiOp for the simple reason that the BiOp was released well over a year after the

2   end of the Draft EA comment period. Rather, the objection period following the issuance

3   of the DN/EA/FONSI was the first opportunity Plaintiffs had to raise flaws in the BiOp

4   and the EA's reliance on those flaws. Nevertheless, USFS summarily dismissed these

5   objections without responding to them on the merits.

**FIRST CLAIM FOR RELIEF**
**(Violation of ESA and APA—Failure to Use Best Scientific and Commercial Data**
**Available in Analyzing Impacts of the Sunnyside Project)**

8   112.   Plaintiffs hereby reallege, as if fully set forth herein, each and every

9   allegation contained in paragraphs 1 through 111.

10  113.   The ESA demands that USFS, in consultation with FWS, ensure that the

11  actions it takes will not jeopardize the survival of endangered or threatened species or

12  destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). In undertaking

13  such consultations, the ESA requires that "each agency shall use the best scientific and

14  commercial data available." *Id*.

15  114.   Here, FWS's BiOp for the Sunnyside Project dismissed the potential for the

16  Sunnyside Project's chronic noise impacts to cause serious injury to Mexican spotted

17  owls, including permanent abandonment of their long-established territories in the project

18  area, by disregarding key limitations and cautions in the Delaney (1999) scientific study

19  on which the BiOp purported to rely, and by disregarding altogether the relevant

20  scientific information contained in the Mason (2016) and Senzaki (2016) studies

21  concerning chronic noise impairment of owl foraging.

22

115.    Further, in examining impacts of the Sunnyside Project together with the contemporaneous development of the Hermosa Project on the nearby Trench Camp property, FWS's BiOp ignored available commercial data from the Hermosa Project developer that provided a specific development timeline and description of planned project developments. Instead, FWS's BiOp offered only cursory discussion of likely cumulative impacts from the Sunnyside Project together with the Hermosa Project based on a stale media report that omitted key information about Hermosa Project scope and timing.

116.    USFS relied on FWS's BiOp to fulfill its own ESA obligations without acknowledging these omissions or undertaking any independent analysis to address them. USFS's unjustified reliance on FWS's BiOp continued up to and included USFS's approval of the plan of operations for the Sunnyside Project on September 7, 2023.

117.    Both agencies thus failed to use the best scientific and commercial data available to determine whether the Sunnyside Project is likely to jeopardize ESA-listed species or destroy or adversely modify their critical habitat, as required by the ESA.

**SECOND CLAIM FOR RELIEF**
**(Violation of ESA and APA—Arbitrary Disregard of Relevant Factors in Evaluating Project Impacts on ESA-Listed Species)**

118.    Plaintiffs hereby reallege, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 117.

119.    The ESA demands that USFS, in consultation with FWS, ensure that the actions it takes will not jeopardize the survival of endangered or threatened species or destroy or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). In so doing,

53

USFS and FWS must "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." *Ctr. for Biological Diversity*, 698 F.3d at 1121 (cleaned up).

120.    Here, both USFS and FWS repeatedly ignored or misconstrued relevant information in determining that the Sunnyside Project would be unlikely to jeopardize or destroy or adversely modify critical habitat for the Mexican spotted owl, Western yellow-billed cuckoo, jaguar, and ocelot.

121.    Both agencies repeatedly discounted project impacts by asserting that affected species could simply shift their activities elsewhere to avoid disturbance effects, without considering the prospect that such movements would drive affected species into the impact zones of other projects proceeding contemporaneously in the same area of the Patagonia Mountains.

122.    In adopting such reasoning and reaching such conclusions, USFS and FWS failed to consider the relevant factors and articulate a rational connection between the facts they found and the choices they made. Further, USFS's reliance on FWS's BiOp in such circumstances disregarded FWS's irrational reasoning and failed to discuss readily available information that undercut the BiOp's conclusions.

## THIRD CLAIM FOR RELIEF
### (Violation of NEPA and APA—Arbitrary and Capricious Analysis of Cumulative Impacts of the Sunnyside Project)

123.    Plaintiffs hereby reallege, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 122.

54

124.    NEPA demands that an agency preparing an EA take a "hard look" at the cumulative impacts of the project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. *Ctr. For Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012); *see also* 40 C.F.R. §§ 1508.9, 1508.25(c) (2019). The applicable regulations define a cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*. § 1508.7 (2019).

125.    An EA must "fully" address cumulative impacts, *Kern*, 284 F.3d at 1078, giving "a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Te-Moak Tribe of W. Shoshone of Nev. v. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010). Merely "conclusory" analysis is insufficient. *Id*. at 604. Rather, the agency "must provide some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ctr. for Cmty. Action & Env't Just. v. Fed. Aviation Admin*., 61 F.4th 633, 644 (9th Cir. 2023) (cleaned up).

126.    Here, the Sunnyside Project NEPA documents omitted any detailed or quantified consideration of the effects that nearby mineral projects would cumulatively

have on ESA-listed species. USFS's NEPA documents failed to discuss at all the cumulative impact of the Sunnyside Project together with the fast-tracked Hermosa CMP project in the Coronado National Forest, a failure that the agency's post-decisional SIR cannot cure. *See Idaho Sporting Cong.*, 222 F.3d at 567 ("It is inconsistent with NEPA for an agency to use an SIR, rather than a supplemental EA or EIS, to correct this type of lapse."). USFS's NEPA documents also offered only cursory discussion of Sunnyside's cumulative impact with the Hermosa Project on the private Trench Camp property. The agency thus failed to adequately assess the impacts these projects would cumulatively have on habitat connectivity and the likelihood of habitat abandonment. Such omissions and cursory, incomplete, and very brief discussions of other nearby mineral projects are arbitrary and capricious. The EA lacks "a sufficiently detailed catalogue" of other projects, *see Te-Moak Tribe*, 608 F.3d at 603, and "quantified or detailed information" about their cumulative impacts. *Ctr. for Cmty. Action & Env't Just.*, 61 F.4th at 644.

127.    These omissions particularly undermined the USFS NEPA documents' determinations regarding the Sunnyside Project's impact on Mexican spotted owls. Such determinations failed to incorporate any quantitative analysis of noise and light impacts on affected owls from the Sunnyside Project and adjacent developments, and instead relied on the flawed FWS BiOp to justify a determination that the Sunnyside Project would not significantly impact this species. Indeed, in multiple other cases involving impacts to spotted owls, the Ninth Circuit has held a cumulative impacts analysis to be "insufficient" where it "merely contemplated other projects but had no quantified assessment of their combined impacts." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th

56

Cir. 2020) (cleaned up); *see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004). USFS similarly violated NEPA here.

128.    The arbitrariness of USFS's cumulative impacts analysis is highlighted by the fact that this Court concluded in 2015 that USFS's determination that the Sunnyside Project would not significantly affect ESA-listed species was "undermined" by the agency's "failure to consider the Sunnyside Project's cumulative effects in relation to other temporally and geographically similar mineral exploration projects," including an earlier private-land Hermosa mineral project. *Defenders of Wildlife*, No. CV-14-02446-TUC-RM, at 13. This Court explained: "The record indicates that the Hermosa Project will have similar environmental effects as the Sunnyside Project, meaning the environmental disturbances from the projects will exist over a larger geographical area and a larger temporal timeframe than that analyzed in the revised Decision Memorandum." *Id*. at 15–16. Yet today, nine years after that ruling—as the ongoing and anticipated mineral projects in the region have expanded—USFS has again unlawfully continued to neglect analyzing cumulative impacts in violation of NEPA.

### FOURTH CLAIM FOR RELIEF
### (Violation of NEPA and APA—Agency Action Unlawfully Withheld Due to Failure to Prepare Supplemental Environmental Analysis)

129.    Plaintiffs hereby reallege, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 128.

130.    NEPA requires an agency to supplement its EA analysis if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (2019); *Idaho*

1    *Sporting Cong.*, 222 F.3d at 566 n.2. This duty applies (1) "[i]f there remains major

2    Federal action to occur," and (2) "if the new information is sufficient to show that the

3    remaining action will affect the quality of the human environment in a significant manner

4    or to a significant extent not already considered." *Marsh v. Or. Natural Res. Council,* 490

5    U.S. 360, 374 (1989) (cleaned up); *accord Norton v. S. Utah Wilderness Alliance*, 542

6    U.S. 55, 73 (2004) (reiterating that NEPA requires supplemental environmental analysis

7    "if there remains major Federal action to occur") (cleaned up). In this regard, USFS's

8    approval of a plan of operations for mineral development activity is "a 'major federal

9    action' triggering NEPA's requirements," and that action is not completed until the plan

10    is approved. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095 (9th Cir. 2013)

11    (quoting *Norton*, 542 U.S. at 73).

12        131.    Here, USFS failed to supplement its EA analysis for the Sunnyside Project

13    despite receiving significant new information relevant to environmental concerns about

14    that Project before approving the plan of operations for the Sunnyside Project. USFS

15    issued its approval of the plan of operations for the Sunnyside Project on September 7,

16    2023. As discussed, USFS's EA, FONSI, and DN for the Sunnyside Project omitted any

17    mention of Hermosa CMP. Yet, prior to approving the plan of operations for the

18    Sunnyside Project, USFS received significant new information about the substance and

19    scope of Hermosa CMP that was relevant to environmental concerns about the

20    cumulative impacts of the Sunnyside Project and Hermosa CMP. Such information

21    included a project description contained in the FAST-41 Initiation Notice submitted by

22    the Hermosa CMP sponsor with detailed locational information and, ultimately, a

proposed plan of operations for Hermosa CMP. These materials demonstrated that

Hermosa CMP was reasonably foreseeable and supplied project information establishing

a significant potential for cumulative impacts arising from Hermosa CMP and the

Sunnyside Project, as well as from the combined impact of these two projects and the

ongoing Hermosa Project. Nevertheless, USFS failed to supplement its environmental

analysis of the Sunnyside Project, including its analysis of cumulative impacts, prior to

approving the plan of operations for that Project.

132.    USFS's post-decisional SIR failed to justify this omission. An SIR is not

contemplated by NEPA and thus cannot substitute for a supplemental NEPA analysis

where such an analysis is legally required. *See Idaho Sporting Cong.*, 222 F.3d at 565–

66. Further, the SIR that USFS prepared offered no meaningful discussion of the

cumulative impacts of the Sunnyside Project and Hermosa CMP. Instead, it offered only

conclusory assertions that the cumulative impacts of the Sunnyside Project would not

change based on new information about Hermosa CMP. It also disregarded important

evidence that such cumulative impacts would be significant, including the evidence

provided in the letter and exhibits that Plaintiffs submitted to the agency on September

16, 2024. In so doing, the SIR failed to take "the requisite 'hard look'" necessary to

determine the significance of the new information and evidence concerning the

cumulative environmental impacts of the implementation of the Sunnyside Project

together with Hermosa CMP. *Friends of the Clearwater*, 222 F.3d at 561.

1    133.    In sum, USFS failed to supplement its EA analysis as required by NEPA.

2  This failure constituted agency action unlawfully withheld or unreasonably delayed under

3  5 U.S.C. § 706(1) and further violated NEPA.

**FIFTH CLAIM FOR RELIEF**
4
**(Violation of NEPA and APA—Arbitrary and Capricious Analysis of Threats to**
5  **Groundwater in the Sunnyside Project Area)**

6    134.    Plaintiffs hereby reallege, as if fully set forth herein, each and every

7  allegation contained in paragraphs 1 through 133.

8    135.    NEPA requires an agency preparing an EA to take "a 'hard look' at the

9  likely effects of the proposed action" to determine their potential significance. *Ctr. for*

10 *Biological Diversity*, 695 F.3d at 916. Further, while "[a]n agency's decision to forego

11 issuing an EIS may be justified in some circumstances by the adoption of [mitigation]

12 measures," to justify such a decision, the proposed mitigation measures "must be

13 developed to a reasonable degree," supported by "analytical data," and "constitute an

14 adequate buffer against the negative impacts that may result from the authorized

15 activity." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733–34 (cleaned up).

16    136.    NEPA also requires establishment of the baseline conditions of the affected

17 environment as a "practical requirement" of the environmental analysis process. *Oregon*

18 *Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568 (9th Cir. 2016) "Without establishing the

19 baseline conditions which exist" before the project begins, "there is simply no way to

20 determine what effect the proposed [action] will have on the environment and,

21 consequently, no way to comply with NEPA." *Half Moon Bay Fisherman's Mktg. Ass'n*

22 *v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988); *see also Great Basin Res. Watch v.*

*Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (holding same). While there are several ways for an agency to establish baseline conditions, its assessment "must be based on accurate information and defensible reasoning." *Oregon Nat. Desert Ass'n*, 840 F.3d at 570. An "unsupported assumption" is insufficient. *Id*.

137.    Here, USFS's EA and DN/FONSI relied on design features and mitigation measures to prevent water pollution caused by flow of groundwater between aquifers resulting from the Sunnyside Project's drilling activities. Yet USFS's own hydrologist identified deficiencies in the Sunnyside Project's package of design features and mitigation measures that threatened groundwater pollution impacts, and USFS offered no rational response to the hydrologist's analysis. Accordingly, USFS arbitrarily failed to take a hard look at the sufficiency of the Sunnyside Project's design features and mitigation measures to safeguard water sources in violation of NEPA. Further, while USFS relied on this same package of design features and mitigation measures to render Project impacts insignificant such that NEPA did not require preparation of an EIS for the Sunnyside Project, these features and measures were not reasonably developed or adequately supported by analytical data and did not adequately buffer against pollution impacts arising from the flow of groundwater between aquifers resulting from the Sunnyside Project. For this reason too, USFS's reliance on these features and measures was arbitrary and unlawful in violation of NEPA.

138.    Similarly, USFS's reliance on these same design features and mitigation measures to forego further rational analysis of baseline groundwater conditions in the Sunnyside Project area was also arbitrary and unlawful in violation of NEPA. USFS's

reliance on 22-year-old water samples—taken from a small number of wells outside the project area—as "surrogate data" to establish baseline water conditions for its environmental analysis of the Sunnyside Project, without rational analysis of more proximate wells indicating a pollution threat, was arbitrary and capricious. USFS sought to obviate the need for further baseline groundwater analysis by claiming that the Sunnyside Project's design features and mitigation measures prevented any possibility of groundwater flow between aquifers. However, as discussed above, evaluation by the agency's own expert hydrologist demonstrated that the Project's package of design features and mitigation measures was inadequate for this purpose. Accordingly, cogent analysis of baseline groundwater conditions was important for USFS's Sunnyside Project decision, but omitted from USFS's EA and DN/FONSI. For this reason too, USFS's analysis of threats to groundwater violated NEPA.

### SIXTH CLAIM FOR RELIEF
**(Violation of NEPA, 36 C.F.R. § 218.8(c), and APA—Arbitrary and Capricious Rejection of Scientific Objections Regarding the Sunnyside Project)**

139.    Plaintiffs hereby reallege, as if fully set forth herein, each and every allegation contained in paragraphs 1 through 138.

140.    Public participation is integral to the NEPA process. The applicable regulations are clear that "[t]he agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing [environmental] assessments." 40 C.F.R. § 1501.4(b) (2019); *see also id.* § 1506.6(a) (providing in part that agencies shall "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures"). Although the Ninth Circuit has "not established a minimum level of public

comment and participation required by the regulations governing the EA and FONSI process," the court "clearly ha[s] held that the regulations at issue [i.e., 40 C.F.R. § 1501.4(b) and § 1506.6] must mean something." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003).

141. Here, USFS refused to consider Plaintiffs' objections to the BiOp's flaws and EA's reliance on those flaws because Plaintiffs had not done the impossible—critique the BiOp well over a year before the BiOp was made public. This "Catch-22"-style frustration of public engagement to ensure the legitimacy of USFS's environmental analysis violates NEPA under any reasonable standard for minimum allowable levels of public participation in the EA process.

142. In addition to violating NEPA, this refusal violated the USFS's own regulation governing the Sunnyside Project objections process. The USFS regulation concerning resolution of objections makes clear that a written response is mandatory. 36 C.F.R. § 218.11(b)(1). Further, the USFS regulation concerning the filing of objections states that "[i]ssues raised in objections must be based on previously submitted specific written comments regarding the proposed project or activity and attributed to the objector, *unless the issue is based on new information that arose after the opportunities for comment*." 36 C.F.R. § 218.8(c) (emphasis added); *see also All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1034 (9th Cir. 2018) (holding that plaintiff did not waive objection to USFS project decision where plaintiff's "failure to object at an earlier time resulted from the Forest Service's failure to disclose this aspect of the Project in the Draft

Environmental Impact Statement. It was first revealed in the Final Environmental Impact

Statement, to which [the plaintiff] promptly objected.").

143.    USFS's failure to consider Plaintiffs' objections to the BiOp's flaws and

EA's reliance on those flaws is arbitrary and unlawful under these authorities. The

objections that USFS ignored strike at the heart of the agency's no-significant-effects

finding. They concerned the significant effects of sustained noise on owls, the cumulative

effects on owls, the significant effects of sustained noise on cuckoos, and the agency's

refusal to require the cessation of drilling during cuckoo breeding season. A proper

consideration of these objections would have required the agency to reconsider its FONSI

and authorization of the Sunnyside Project. Instead, USFS dodged its otherwise

applicable regulatory obligation to respond to these objections on their merits by

summarily, and improperly, dismissing them. In so doing, USFS violated NEPA and 36

C.F.R. § 218.8(c).

**REQUEST FOR RELIEF**

Therefore, Plaintiffs respectfully request that this Court:

1.    Declare that USFS violated the ESA, NEPA, and the APA in issuing its

EA, FONSI, and DN authorizing the Sunnyside Project, and in failing to supplement the

environmental analysis set forth and referenced in those documents.

2.    Declare that FWS violated the ESA in issuing its BiOp for the Sunnyside

Project.

3.    Award Plaintiffs permanent injunctive relief prohibiting implementation of

USFS's Sunnyside Project decision.

64

1          4.      Set aside and vacate USFS's EA, FONSI, DN, and authorization of the

2    Sunnyside Project.

3          5.      Set aside and vacate FWS's BiOp for the Sunnyside Project.

4          6.      Award Plaintiffs their reasonable attorneys' fees and costs.

5          7.      Grant such other and further relief as the Court deems just, equitable, and

6    proper.

7          Respectfully submitted this 30th day of September, 2025.

8                                                    /s/ Scott W. Stern
                                             Scott W. Stern (California Bar No. 336427)
9                                            (*admitted pro hac vice*)
                                             Earthjustice
10                                           50 California Street, Suite 500
                                             San Francisco, CA 94111
11                                           sstern@earthjustice.org
                                             Phone: (415) 217-2117
12
                                             Timothy J. Preso (Montana Bar No. 5255)
13                                           (*admitted pro hac vice*)
                                             Earthjustice
14                                           313 East Main Street
                                             PO Box 4743
15                                           Bozeman, MT 59715-4743
                                             tpreso@earthjustice.org
16                                           Phone: (406) 586-9699

17                                           Roger Flynn (Colorado Bar No. 21078)
                                             Jeffrey C. Parsons (Colorado Bar No. 30210)
18                                           (*admitted pro hac vice*)
                                             Western Mining Action Project
19                                           PO Box 349
                                             440 Main Street, Suite 2
20                                           Lyons, CO 80540
                                             wmap@igc.org
21                                           Phone: (303) 823-5738

22                                           *Attorneys for Plaintiffs*

                                                      65